**NAEGELE OUTDOOR ADVERTISING CO. OF LOUISVILLE, A DIVISION OF NAEGELE, INC., Plaintiff-Appellee,**

v.

**C. Mike MOULTON; Louis J. Hollenbach \*; Billy G. Wellman, Defendants-Appellants.**

No. 84–5359.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1984.

Decided Sept. 23, 1985.

---

\* While this case was pending for decision, an election was held in which Louis J. Hollenbach succeeded Paul W. Richwalsky, Jr., as the Commonwealth's attorney of Jefferson County, Kentucky. A substitution of parties was thereafter approved pursuant to Fed.R.App.P. 43cc.

Cathy Craven Snell, Gen. Counsel, David L. Armstrong, Atty. Gen., George Geoghegan, III (argued), Sarah M. Jackson, Frankfort, Ky., for defendants-appellants.

Bert T. Combs (argued), M. Stephen Pitt, Wyatt, Tarrant & Combs, Charles R. Simons, Louisville, Ky., for plaintiff-appellee.

Before LIVELY, Chief Judge; ENGEL, Circuit Judge; and PECK, Senior Circuit Judge.

ENGEL, Circuit Judge.

Naegele Outdoor Advertising Company of Louisville (Naegele) brought an action under 42 U.S.C. § 1983 against C. Mike Moulton, individually and as an officer of the Kentucky State Police, Billy G. Wellman, as Commissioner of the Kentucky State Police, and Paul W. Richwalsky, Jr., as Commonwealth's attorney of Jefferson County, Kentucky, (Defendants) to enjoin Defendants from conducting a criminal investigation of Naegele. The United States District Court for the Western District of Kentucky granted a preliminary injunction prohibiting Defendants, their servants, agents, successors, and all persons in privity with them, from conducting any criminal investigation of Naegele or any of its employees for any violation of the provisions of chapter 121 of the Kentucky Revised Statutes until the Kentucky Registry of Election Finance (Registry) holds a hearing, determines that there exists probable cause to believe a willful violation has occurred, and refers the possible violation for investigation and prosecution in the manner set out in chapter 121. Defendants, being thus enjoined, appeal.

In September, 1983, a former employee of Naegele contacted the Kentucky State Police (KSP) and alleged that Naegele had defrauded some of its customers and had violated the Kentucky campaign finance laws.[1] Acting upon this complaint, Defendant Moulton and Linda Park, an Assistant Commonwealth's attorney for Jefferson County, prepared a search warrant and accompanying affidavit which were presented to a Jefferson County Circuit Court judge on November 18, 1983. Moulton subsequently executed the search warrant and seized numerous documents from Naegele. A federal search warrant was simultaneously executed by the Federal Bureau of Investigation (FBI), which was investigating the interstate aspects of the alleged activity. The involvement of the FBI in the investigation and search is not challenged in this litigation.

Shortly thereafter, Naegele filed suit in the district court under the Civil Rights Act, 42 U.S.C. § 1983. Naegele sought injunctive relief on the ground that the investigation and search by Defendants circumvented the statutory requirements of

1. KY.REV.STAT.ANN. § 121.025 (Baldwin 1981) prohibits a corporation from making political contributions, and Ky.Rev.Stat.Ann. § 121.035 prohibits a corporation from reimbursing any person who has made a political contribution. Naegele allegedly violated the campaign finance laws by directing its officers and account executives to contribute to the 1983 Kentucky gubernatorial campaign of Martha Lane Collins upon the understanding that they would be reimbursed by submitting expense vouchers to offset their contributions. Naegele allegedly defrauded its customers by simultaneously renting the same billboard space to more than one customer.

chapter 121 of the Kentucky statute, and thereby violated Naegele's constitutional rights to due process and equal protection. Specifically, Naegele asserted that chapter 121 vests in the Registry the exclusive jurisdiction to initially investigate alleged unlawful campaign violations, and section 121.140 of the Kentucky statute requires the Registry, before referring an investigation to the Attorney General or appropriate local prosecutor, to give notice, hold a hearing, and determine whether there is probable cause to believe a willful violation has occurred. This statutory scheme, Naegele claimed, creates a constitutionally protected liberty interest in Naegele and others to be free from the stigmatizing effects and adverse publicity that normally arises out of the issuance and execution of a search warrant.

The district court agreed that chapter 121 created a constitutionally protected due process liberty interest. The district court concluded that chapter 121 allowed the Commonwealth's attorneys and the Kentucky State Police to investigate election violations only after the Registry follows the procedures in section 121.140 and refers a violation to them. According to the district court, Kentucky, through these procedures, created extensive due process rights in persons who may be charged with violating its election laws, including the right to be free from any criminal proceedings and the execution of a search warrant until prior repair is made to the Registry.

> [I]t would seem that Kentucky, by its statutes, has created in plaintiff and its officers a right to be free from stigmatizing consequences of adverse publicity, arising out of the improper issuance of a search warrant, until it has had a due process opportunity to rebut the inferences that have arisen by reason of the issuance of the search warrant.

*Naegele Outdoor Advertising Co. v. Moulton*, No. C83–1144 L(A), slip op. at 13 (W.D.Ky. March 29, 1984). Since prior re-

pair was not made to the Registry, the court concluded that Defendants were violating the liberty interest created by KRS chapter 121, and thus preliminarily enjoined Defendants from continuing their investigation.

## I.

 The question we face is whether Naegele has a protected liberty interest that requires some form of due process to be given before Defendants may issue a search warrant or otherwise conduct an investigation into alleged campaign finance violations by Naegele. A liberty interest may arise from two sources—the Due Process Clause itself and the laws of the states. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). The Due Process Clause of the Fourteenth Amendment incorporates the Fourth Amendment prohibition against unreasonable searches and seizures. Naegele, however, does not claim that the issuance or execution of the search warrant violated the Fourth Amendment prohibition against unreasonable searches and seizures.[2] Moreover, there is no federally guaranteed constitutional right to a hearing or other process before the issuance and execution of a search warrant beyond the demands of the Fourth Amendment. Thus, if there is a protected liberty interest it must arise from the laws of Kentucky.

Whether such a liberty interest exists first depends upon whether chapter 121 of the Kentucky statute provides the exclusive means by which suspected violations of the Kentucky campaign finance laws may be initially investigated. Second, if chapter 121 provides the exclusive means or procedure, we must still determine whether the procedure itself amounts to a constitutionally protected liberty interest. We find first that section 121.140 of the Kentucky statute is not an exclusive procedure to initially investigate campaign finance violations, and second that even if it was, the procedure does not create a liber-

---

**2.** Naegele notes that the affidavit supporting the search warrant was not served with the warrant; however, actual service of the affidavit has never been required as a condition to the valid execution of a warrant. The sufficiency of the affidavit is not challenged.

ty interest. Accordingly, we reverse the order of the district court.

## II.

The district court found that chapter 121 grants exclusive jurisdiction to the Registry to initially investigate unlawful campaign violations. According to the district court, the procedures set forth in section 121.140 must be followed by the Registry before a complaint of campaign finance violations may be investigated or prosecuted by Defendants. Defendants contend that the chapter does not prohibit the police or Commonwealth's attorneys from making independent investigations, but merely regulates the activities of the Registry when it performs its own duties under the chapter. We agree that chapter 121 does not prohibit the police or Commonwealth's attorneys from making independent investigations. We find nothing in the statute, the statutory history, or administrative interpretations to suggest a contrary conclusion.

Chapter 121 is a comprehensive statutory scheme for the regulation of campaign financing. The chapter prohibits certain activities, including corporate contributions to candidates (section 121.025), corporate reimbursement of someone who makes a political contribution (section 121.035), and candidate promises of action to be taken when elected in consideration for a person's financial support (section 121.055). The chapter also imposes certain duties including the duty of a candidate to designate a campaign treasurer (section 121.160), the duty of the campaign treasurer to file expenditure reports (section 121.180), and the duty to register any candidate committee (section 121.170). The Kentucky Registry of Election Finance, an independent agency of the state government, is to adopt such regulations and perform such acts as are necessary to implement these duties (section 121.120). Criminal sanctions are imposed for willful violations of the chapter's provisions (section 121.990).

Naegele asserts that the provisions of section 121.120, which define the duties and powers of the Registry, and section 121.-140, which relates to the investigation of complaints, amount to a grant of exclusive jurisdiction in the Registry initially to investigate alleged violations, exclusive of any independent right in the Kentucky State Police or the Commonwealth's attorneys to act. The provisions are lengthy, but we set them out in full.

**"121.120 Duties and powers of registry**

"(1) The registry shall appoint a full-time executive director, legal counsel and an accountant for auditing purposes, all of whom shall serve at the pleasure of the registry. The registry shall also appoint such other employes as are necessary to carry out the purposes of this chapter.

"(2) It shall be the duty of the registry to conduct hearings with regard to possible violations and for the effectual carrying out of its responsibilities the registry shall have the authority to initiate a civil action in any court of competent jurisdiction for the purpose of enforcing compliance with the provisions of this chapter or enjoining violations thereof or recovering any penalty prescribed by this chapter.

"(3) The registry shall adopt such regulations, official forms and perform such duties as are necessary to implement the provisions of KRS 121.015 and 121.100 to 121.200. Without limiting the generality of the foregoing the registry shall:

(a) Develop prescribed forms for the making of the required reports;

(b) Prepare and publish a manual for all candidates and committees, describing the requirements of the law, including uniform methods of bookkeeping and reporting and requirements as to reporting dates and the length of time that candidates and committees are required to keep any records pursuant to the provisions of this chapter;

(c) Develop a filing, coding and cross-indexing system;

(d) Make each report filed available for public inspection and copying during regular office hours at the expense of any person requesting copies of the same;

(e) Preserve all reports for at least four (4) years from the date of receipt;

(f) Prepare and make available for public inspection a summary of all reports grouped according to candidates and parties, containing the total receipts and expenditures, and the date, name, address and occupation, and amount contributed by each contributor, listed alphabetically, shown to have contributed in excess of one hundred dollars ($100);

(g) Prepare and publish an annual report with cumulative compilations named in paragraph (f) above;

(h) Distribute upon request, for a nominal fee, copies of all summaries and reports;

(i) Determine whether the required reports have been filed and if so, whether they conform with the requirements of this chapter; give notice to delinquents to correct or explain defections; issue an order, if appropriate, as provided in KRS 121.140(2); make public the fact that a violation has occurred and the nature thereof;

(j) Hold public hearings, investigate any violations in reporting, and issue subpoenas for the production of any books, papers, correspondence, memorandums or other records and the attendance of witnesses which the registry deems relevant or material for the purpose of any investigation;

(k) Conduct random audits of receipts and expenditures of candidates running for city, county, urban-county government, and district offices. When the registry audits the records of any selected candidate, it shall also audit the records of all other candidates running for the same office in the selected city, county, urban-county government, or district office;

(l) Conduct audits of receipts and expenditures of all candidates running for statewide office;

(m) Candidates shall maintain their records for a period of four (4) years from the date of the general election in their respective political races;

(n) Make investigations with respect to reports upon complaint by any registered voter and to initiate proceedings on its own motion;

(o) Adopt and promulgate in accordance with this subsection a "Code of Fair Campaign Practices";

(p) Forward to the attorney general or to the appropriate commonwealth's attorney any violation of this chapter which may become the subject of civil prosecution. (Enact. Acts 1974, ch. 130, § 186 ch. 292 § 4, effective July 15, 1980).

**"121.140 Investigation of complaint; hearing; issuance or order; prosecution; judicial review**

"(1) Upon the sworn complaint of any person, or on its own initiative, the registry shall investigate alleged violations of this law. Not later than five (5) days after the registry receives a sworn complaint, or after it decides to investigate on its own initiative, it shall give notice of the investigation to the person complained against. The person complained against shall be given five (5) days from receipt of notice of the investigation in which to respond to the complaint of alleged violations of this law. Not later than five (5) days after receipt of a response from the person complained against, the registry shall:

(a) Acknowledge receipt of the complaint to the complainant, where appropriate;

(b) Acknowledge receipts of the response from the person complained against; and

(c) Notify, in writing, the person who made the complaint and the person complained against of what action, if any, the registry has taken or plans to take on the complaint together with the reasons for such action or nonaction. If the registry does not decide within five (5) days of receipt of the response what action to take, it shall notify the person who made the complaint of the reasons for the delay and shall subsequently give him the appropriate notification.

"(2) When the registry concludes that there is probable cause to believe that the

law has been violated, it may hold a hearing to determine if such violation has occurred. If a hearing is held, the person complained against may choose whether the hearing shall be open or closed. At the hearing, the person complained against shall have all of the protections of due process, including but not limited to the right to be represented by counsel, the right to call and examine witnesses, the right to the production of evidence by subpoena, the right to introduce exhibits and the right to cross-examine opposing witnesses. When the registry determines that the preponderance of the evidence shows a violation has occurred, it shall issue an order to the violator to comply with any one or more of the following requirements:

(a) To cease and desist violation of this law;

(b) To file any reports or other documents or information required by this law; or

(c) To pay a penalty not to exceed one hundred dollars ($100) a day for failure to file any report or other document or information required by law until such report, document or information is filed.

"(3) If the registry concludes that there is probable cause to believe that the law has been violated willfully, it may refer such violation to the attorney general or to the appropriate local prosecutor for investigation and prosecution. The attorney general or the appropriate local prosecutor shall have responsibility for prosecutions under the law and may request from the registry all evidence collected in its investigation.

"(4) Any person directly involved or affected by an action of the registry which is final, other than of a determination to refer a violation to the attorney general or to the appropriate local prosecutor for prosecution, may seek judicial review of such action.

"(5) If judicial review is sought of any action of the registry relating to a pending election, the matter shall be advanced on the docket of the court. The court may take any steps authorized by law to accelerate its procedures so as to permit a timely decision.

Naegele asserts that one can infer from the foregoing provisions that the Kentucky legislature intended the Registry to have exclusive jurisdiction to initially investigate alleged violations. We cannot agree. There is nothing in these two provisions that states that the Registry has exclusive jurisdiction or that the police or local prosecutors shall forward information of potential violations to the Registry. To the contrary, section 121.140 provides that the Attorney General or appropriate local prosecutor shall have responsibility for prosecutions, and they may request from the Registry all evidence collected in its investigation. In addition, section 121.990(11) provides that "the attorney general, Commonwealth's attorney, the registry, or any qualified voter may sue for injunctive relief to compel compliance with the provisions of KRS 121.100 to 121.200." The Attorney General and Commonwealth's attorney necessarily will have to investigate before knowing when it is appropriate to sue. The express statutory language contemplates both the involvement of the Registry and traditional law enforcement personnel in investigating violations of the campaign finance laws.

The statutory history also shows that the Kentucky legislature adopted the procedures of section 121.140 to guide the decision-making of the Registry, not to vest the Registry with exclusive jurisdiction to the exclusion of traditional law enforcement personnel. Direct and indirect corporate contributions to candidates for political office in Kentucky have been prohibited by Kentucky since the Corrupt Practices Act of 1916, 1916 Ky.Acts 53, (1916 Act). According to its Preamble, the 1916 Act was enacted "to promote pure elections, primaries, and conventions, and to prevent corrupt practice in the same; to limit the expenses of candidates; to prescribe the duties of candidates and providing penalties and remedies for violations, and declaring void, under certain conditions, elections in which these provisions or any of them

have been violated." The 1916 Act made it unlawful "for any corporation ... to contribute, either directly or indirectly, money, service or thing of value, towards the nomination or election of any State, county, city, town, district or municipal officer...." This provision prohibiting corporate political contributions has remained virtually unchanged and is now codified as section 121.-025. The prohibition presently found in section 121.035 has remained virtually unchanged since 1922. Carroll's Kentucky Statutes §§ 1574a–1, 1574a–2 (6th Ed. 1922).

The 1916 Act provided that any corporation or agent that makes a political contribution was guilty of a misdemeanor. The police and local prosecutors would investigate and enforce these provisions. There was no Registry. The commissions and county boards that were authorized to issue certificates of election were "without authority either to charge or adjudge a candidate guilty of violating the act." *Young v. Jefferson County Election Commission*, 304 Ky. 81, 200 S.W.2d 111, 113 (1947). A defeated candidate could contest an election, but only if he was not himself guilty of corrupt practices. *Britton v. Garland*, 335 S.W.2d 329, 331 (Ky.1960). Thus, the police and local prosecutors were the only effective enforcement mechanism of the 1916 Act.

In 1966, the Kentucky legislature created the Kentucky Registry of Election Finance as an independent agency of the state government. The 1966 Act, 1966 Ky.Acts 903, provided greater regulation of campaign contributions and expenditures. The Act continued to require candidates to file expenditure reports, but now the reports were to be sent to the Registry and checked by the Registry for accuracy. The 1966 Act, however, did not refer in any way to those provisions of the 1916 Act that prohibited corporations from making political contributions.

In creating the Registry, the legislature also imposed upon it the duty to adopt such regulations, forms, and duties as were necessary to implement the provisions of the

Act. Under the 1966 Act, while its role was limited, the Registry could contest an election. *Dempsey v. Stovall*, 418 S.W.2d 419 (Ky.1967). The Act, however, contemplated that the Commonwealth's attorneys would investigate and prosecute violations. The Act provided that "[t]he Registry shall also report to the Attorney General and the Commonwealth's attorneys such list [of candidates delinquent in filing statements and reports]." The continued enforcement by the Commonwealth's attorneys of the provisions prohibiting corporate contributions is implicit since the 1966 Act did not refer to them.

The Kentucky legislature further amended the campaign finance laws in 1974. The Corrupt Practices Act of 1974, 1974 Ky. Rev.Stat. & R.Serv. 697 (Baldwin), undoubtedly a response to Watergate, was "a complete reform program designed for present day elections. As a part of this reform program, the Registry of Election Finances, which had been created in 1966, was given supervisory control over all election financing.... [T]he Registry had struggled for recognition in controlling campaign fund raising and expenditures. The reform program gave the Registry the necessary strength to monitor effectively all of the financial aspects of political campaigns." *Lee v. Commonwealth*, 565 S.W.2d 634, 636 (Ky.App.1978). Under the new scheme, the Registry, as well as any candidate for office or any qualified voter, could bring an action to declare a vacancy. *Kentucky Registry of Election Finance v. Jordan*, 583 S.W.2d 90, 96 (Ky.App.1979). With the creation of a stronger Registry, it was no longer the choice of a defeated candidate alone to determine whether a penalty should be exacted for failure to comply with the statute. *Id.* at 97.

The 1974 amendments clearly strengthened the investigatory and supervisory power of the Registry. The amendments provided for a full-time executive director, legal counsel, and an accountant for auditing, and authorized the Registry "to make investigations with respect to reports upon complaint by any registered voter, and to

initiate proceedings on its own motion." Also, authority was given to the Registry to initiate civil actions for the purpose of enforcing compliance with the provisions of chapter 121, enjoining violations thereof, or recovering any penalty prescribed by chapter 121. The Registry became a "watchdog" over election financing to insure that Kentucky's elections would not be corrupted. Nevertheless, there is nothing in the amendments to indicate an intent of the legislature to restrict the enforcement activities of the Commonwealth's attorneys or police. The amendments provided that the Registry is to "forward to the attorney general or the appropriate commonwealth's attorney any violations of this chapter which may become the subject of civil prosecution." Further, the amendments provided that after a preliminary investigation and a hearing, "the registry itself, if it has reasonable grounds to believe that a violation of this chapter has occurred shall initiate action and notify the attorney general or the appropriate commonwealth's attorney of the suspected violation."[3] The 1974 amendments contemplate a joint enforcement effort between the traditional enforcement personnel and the new stronger independent Registry.

In 1980, the Kentucky legislature again amended the campaign finance laws. The 1980 amendments, 1980 Ky.Acts 949, added administrative sanctions in addition to the civil and criminal penalties. The Registry was authorized, after it determined that the preponderance of the evidence showed a violation had occurred, to issue an order to a violator:

(a) To cease and desist violation of this law;

(b) To file any reports or other documents or information required by this law; or

(c) To pay a penalty not to exceed one hundred dollars ($100) a day for failure to file any report or other document or information required by law until such report, document or information is filed.

The criminal penalty provisions of the Act were amended to provide for criminal punishment only for willful violations, and the 1980 amendments authorized the Attorney General as well as the Registry, a defeated candidate or qualified voter, to contest an election. The 1980 amendments set forth in greater specificity procedures the Registry must follow upon receipt of a complaint or if on its own initiative it believes a violation has occurred. These procedures, at section 121.140, require notice to be given persons complained against within five days of the receipt of a sworn complaint or of a decision to investigate; require the Registry to find probable cause to believe that the law had been violated before it holds a hearing; and require further procedural safeguards to be followed in the hearing. The amendments also expressly provide that the Registry may refer a violation to the local prosecutor if there is probable cause to believe the law had been violated. The 1980 amendments, however, make no effort to restrict the traditional powers of law enforcement entrusted to the Commonwealth's attorney or the Attorney General. If anything, the Attorney General's powers were strengthened.

As indicated earlier, Naegele allegedly violated sections 121.025 and 121.035. The

---

3. This language is from the forerunner of KY. REV.STAT.ANN. § 121.140. The section provides in full:

> Any registered voter who believes a violation of this chapter has occurred may file a complaint under oath with the registry such complaint shall be kept confidential pending final determination of the merits of the complaint by the registry. The Registry shall conduct a preliminary investigation of the merits of such complaint. If the registry determines that there are no reasonable grounds to believe that a violation has occurred, the com-

plaint shall be dismissed. If the registry determines that there are such reasonable grounds, it shall give notice summoning the persons believed to have committed the violation to a hearing. The registry shall adopt such regulations to govern the conduct of a hearing. The registry itself, if it has reasonable grounds to believe that a violation of this chapter has occurred the registry shall initiate action and notify the attorney general or the appropriate commonwealth's attorney of the suspected violation.

activity prohibited by these sections had been made criminal consistently since 1916 and had been within the power of the Commonwealth's attorneys and police to investigate and prosecute since that date. There was no Registry in 1916; only the police and Commonwealth's attorneys investigated violations. Nothing in the later amendments to the Corrupt Practices Act of 1916 indicates any intent on the part of the Kentucky legislature to deprive the traditional law enforcement officers of their traditional rights to enforce the election laws. Clearly, the objective of the later amendments has been to increase rather than to limit regulation of elections and the control of possible violators.[4] Since the Registry was an agency unknown to Kentucky law until 1976, it follows that the procedures for carrying out its duties necessarily had to be spelled out by the legislature. That the legislature saw fit in 1980 to expand those duties and to refine the procedures of the Register does not in our judgment indicate any implied and certainly no expressed or avowed intent to vest exclusive authority in the Registry to the exclusion of the traditional law enforcement personnel of Kentucky.

We think it important that the Attorney General of Kentucky has by his appearance on behalf of Defendants asserted the continuing authority of Defendants to investigate and prosecute criminal violations under chapter 121. This view is corroborated by John W. Craig, former Executive Director of the Registry. In a sworn affidavit attached to Defendant's response to Naegele's motion for preliminary injunction, Craig stated that he had been the Executive Director of the Registry continuously from July 1, 1976 until the date of the affidavit on December 27, 1983, and

was responsible for the execution of the administrative policies of that agency. He stated further that on occasion during his tenure as Executive Director, the Kentucky State Police had conducted preliminary investigations into violations of the Kentucky Corrupt Practices Act prior to any formal complaint having been filed with the Registry. Finally, Craig stated under oath that "the Registry has not and does not construe or apply KRS 121.140 as prohibiting a *bona fide* law enforcement agency of appropriate jurisdiction from engaging in preliminary investigations of criminal violations of KRS 121.025 or 121.035." To our knowledge, no evidence to the contrary was placed before the district court by Naegele, and we are mindful that "great deference is always given to an administrative agency in the interpretation of a statute within its specific province." *Commonwealth ex rel Beshear v. Kentucky Utilities Co.*, 648 S.W.2d 535, 537 (Ky.App.1982).

■ In conclusion, we believe that it was error for the trial judge even tentatively to have concluded that the statutory scheme in Kentucky vested exclusive control in the Registry to the exclusion of the Kentucky State Police or the Commonwealth attorneys to independently investigate. The statutory scheme shows only a desire to supplement the traditional authority by increasing the powers and responsibility of the Registry, not to replace the authority of others.

Even assuming, however, an intent to vest exclusive responsibility in the Registry, we do not believe the Kentucky legislature created an identifiable and protected liberty interest of such proportions as to entitle it to protection as a matter of federal constitutional law.[5]

---

**4.** The thrust of the amendments often was to augment the traditional powers because of a belief that in certain cases the enforcement of the Act might not be pursued with sufficient diligence by the Kentucky officers traditionally entrusted with that responsibility. Thus, the creation of a special prosecutor, coming as it did during the Watergate era, would be reflective of a concern not to replace the Commonwealth's attorney as the officer for enforcing

election laws but, rather, to provide an alternative where that officer was unwilling or unable to do so. *See* Ky.Rev.Stat.Ann. § 121.990(12).

**5.** The district court and Naegele relied heavily upon *Carroll Hubbard for Governor Committee v. Kentucky Registry of Election Finance*, No. C79–0157P(B) (W.D.Ky. December 23, 1982), *on remand from*, 663 F.2d 1070 (6th Cir.1981) (order) *rev'g*, 477 F.Supp. 184 (W.D.Ky.1979). In

## III.

A liberty interest can be created by state law, and once such a liberty interest has been created, the Due Process Clause of the Fourteenth Amendment acts to insure that the state created right is not arbitrarily abrogated. *Bills v. Henderson*, 631 F.2d 1287, 1291 (6th Cir.1980). While the bounds of this concept have never been clearly delineated by the Supreme Court, it did, in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), hold with respect to property interests that:

> Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

408 U.S. at 577, 92 S.Ct. at 2709.

Although the Supreme Court has not clearly delineated when a protected liberty interest will arise, the Court has stated that in two situations a liberty interest will not arise. First in *Paul v. Davis*, 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), the Court held that the interest in reputation alone is not sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. In *Davis*, the photograph and name of plaintiff Davis appeared in a "flyer" of "active shoplifters" that was sent to area businessmen by defendant Paul, the Chief of Police for Louisville, Kentucky. Davis brought an action under 42 U.S.C. § 1983 for damages and injunctive relief alleging a violation of rights guaranteed to him by the Constitution. The district court dismissed the complaint for failing to state a claim; the court of appeals reversed finding that the alleged facts, if true, constituted a denial of due process. The Supreme Court granted certiorari to decide "whether [Davis'] charge that [Paul's] defamation of him, standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment." *Id.* at 694, 96 S.Ct. at 1157. The Court decided that it did not.

The Court recognized the "frequently drastic effect of the 'stigma' which may result from defamation by the government," but concluded, nonetheless, that "reputation alone, apart from some more tangible interests" was neither liberty nor property by itself sufficient to invoke the procedural protection of the Due Process Clause. *Id.* at 701, 96 S.Ct. at 1160. Those interests recognized as liberty or property "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and ... the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status." *Id.* at 710–11, 96 S.Ct. at 1164–65 (footnote omitted). There must be "as a result of the state action complained of, a result or status previously recognized by state law [that is] distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we [the Court] found sufficient to invoke the procedural guarantees...." *Id.* at 711, 96 S.Ct. at 1165. Thus, it was the "accompanying loss of government employment" not defamation alone that required procedural due

---

*Hubbard*, the Registry referred possible violations of KRS chapter 121 to the Commonwealth's attorney without affording a hearing to the Carroll Hubbard for Governor Committee. The Committee brought suit alleging that the failure to conduct a hearing violated its First and Fourteenth Amendment rights. The district court abstained on grounds that it would be interfering with a state criminal prosecution. We reversed. On remand, the district court interpreted our order as mandating a hearing prior to the Registry's referral of possible violations to the Commonwealth's attorneys. However, the sole issue decided by the Sixth Circuit was that the abstention doctrine did not apply; nothing more was decided.

process in *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). *Davis*, 424 U.S. at 705–06, 96 S.Ct. at 1162–63. Likewise, it was the "right to purchase or obtain liquor in common with the rest of the citizenry" not defamation alone that required procedural due process in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). *Davis* 424 U.S. at 708–09, 96 S.Ct. at 1164–65. In conclusion, *Davis* holds that defamation alone will not suffice, but must accompany the alteration of a recognized interest or status created by the state.

Second, the Supreme Court in *Olim v. Wakinekona*, 461 U.S. 238, 250 n. 12, 103 S.Ct. 1741, 1748 n. 12, 75 L.Ed.2d 813 (1983), recognized "that an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." In *Olim*, the issue before the Court was whether the transfer of a prisoner from a state prison in Hawaii to one in California implicates a liberty interest within the meaning of the Due Process Clause. Although the applicable state regulations provided that prior to a prison transfer, an impartial program committee was required to hold a hearing, afford the inmate an opportunity to be heard, and allow the inmate to confront and cross-examine witnesses, the Court found that the regulations did not create a liberty interest since the regulations placed no substantive limitations on official discretion. *Id.* at 249, 103 S.Ct. at 1747. The Court stated that " '[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality.' [quoting *Shango v. Jurich*, 681 F.2d 1091, 1100–01 (7th Cir.1982)] Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim*, 461 U.S. at 250, 103 S.Ct. at 1748 (footnote omitted). A state may choose to require procedures for reasons other than protection of substantive rights. *Id.* at 250–51, 103 S.Ct. at 1748–49.

This same point was made by the Supreme Court in *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). In *Helms*, Pennsylvania created a careful procedural structure to regulate the use of administrative segregation. The Court stated that the mere fact that Pennsylvania created a careful procedural structure does not indicate the existence of a protected liberty interest. *Id.*

The creation of procedural guidelines to channel the decision-making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those [that] federal courts might also impose under the Fourteenth Amendment, that the State chose to require.

*Id.*

The reason procedural rights do not create liberty interests in and of themselves is, we believe, a convincingly stated by Judge Kennedy in *Bills v. Henderson*, 631 F.2d 1287 (6th Cir.1980) (cited with full approval by the Supreme Court in *Olim* and by the Seventh Circuit in *Jurich*).

[W]e conclude that procedural rules created by state administrative bodies cannot, of themselves, serve as a basis for a separate protected liberty interest. The problem with allowing such a procedural rule to create a protected liberty entitlement is that the procedural due process analysis breaks down when the second prong of the analysis, the determination of what process is due,. is applied. If the standard analysis is applied and interests are balanced as required in *Wolff v. McDonnell*, [418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)] then the process that is due in a given instance may bear little or no resemblance to the original expectation and so will do little or nothing to protect it.... The

only alternative to the *Wolff* balancing determination would be to equate the process due with the original procedural expectations. If that approach were adopted, there would be a constitutional procedural due process right to have states adhere to any procedural rules promulgated by them. While such adherence is certainly desirable, every deviation from state procedures cannot be viewed as a federal constitutional violation. Such a holding would make a large volume of state proceedings in the prison setting, in executive agency proceedings, and in judicial proceedings subject to complaint in the federal courts on due process grounds. We decline to so expand procedural due process.

631 F.2d at 1298.

In *Davis, supra,* the Court stated that a liberty interest will only arise when, "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished." *Id.,* 424 U.S. at 711, 96 S.Ct. at 1165. Other than the provisions in section 121.140 of the Kentucky statute governing the activities of the Registry itself, nothing in section 121.140 or its statutory history indicates any intention on the part of the Kentucky legislature to confer any special benefit or protection upon persons accused of violating the Kentucky campaign finance laws. Clearly, the objective of the Kentucky campaign finance laws has been to increase rather than to limit the regulation of elections and control of possible violators. Hence, in essence, the question we face is whether the procedures of section 121.140 create a liberty interest.

A careful examination of the legislative and administrative scheme under scrutiny here convinces us that the procedures of section 121.140, as salutary as they may be, reflect no design by the Kentucky legislature to confer any special status upon Naegele let alone one which rises to a liberty interest. We find persuasive the language of the Supreme Court in *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), "[i]t would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those [that] federal courts might also impose under the Fourteenth Amendment, that the State chose to require."

Accordingly, we REVERSE the order of the district granting a preliminary injunction and REMAND for proceedings consistent with this opinion.