62 F.3d 1417
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Kenneth D. COURTNEY and Tammy Courtney, Plaintiffs-Appellants,
v.
Robert E. BEE; Ted DeWolf; James B. Quigley; and the State
of Michigan Department of Social Services,
Defendants-Appellees.
 No. 94-1708.
 United States Court of Appeals, Sixth Circuit.
 Aug. 7, 1995.
 
 Before: MILBURN and NORRIS, Circuit Judges; and GRAHAM,* District Judge.
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiffs Kenneth D. Courtney and wife Tammy Courtney appeal the district court's grant of summary judgment in favor of defendants Robert E. Bee, Ted DeWolf, and James B. Quigley in this 42 U.S.C. Sec. 1983 action in which plaintiffs allege that Kenneth D. Courtney was terminated from his employment at Park Place Living Center in the State of Michigan in violation of his statutory and constitutional rights. Plaintiff Tammy Courtney sued for loss of her husband's consortium. On appeal, the issues are (1) whether the district court erred by granting defendants' motion for summary judgment after determining that plaintiff Kenneth D. Courtney did not have a property interest in continued employment at Park Place Living Center, (2) whether the district court erred by granting defendants' motion for summary judgment after concluding that plaintiffs had not shown that Kenneth D. Courtney possessed a liberty interest in avoiding defendants' determination of his poor moral character, and (3) whether the district court erred by failing to grant plaintiffs' motion for summary judgment on the ground that defendants had deprived Kenneth D. Courtney of his liberty and property interests without due process of law. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On March 19, 1992, plaintiff Kenneth D. Courtney completed an application for employment with Park Place Living Center ("Park Place"), an adult foster care facility located in Kalamazoo, Michigan, and licensed by the State of Michigan. Courtney indicated on the application that he had not been convicted of any crimes. Furthermore, he entered his signature under an acknowledgement that dishonest or false answers could be grounds for termination of employment. In addition, on April 24, 1991, Courtney signed an employment agreement that contained the following language:
 
 
 3
 In consideration of my employment, I agree to conform to the rules and regulations of Park Place Manor, and my employment and compensation can be terminated without cause and without notice at any time, at the sole discretion of Park Place Manor. I further understand that no one other than the manager has any authority to enter into any agreement or contact [sic] for any specified period of time, or to make any agreement contrary to the foregoing.
 
 
 4
 J.A. 102.
 
 
 5
 Courtney began working for Park Place in April 1991. He was employed as a nurses' aide, responsible for, among other things, dispensing medication to patients. Upon commencement of his employment, Courtney signed a Michigan Department of Social Services ("DSS") Licensing Record Clearance Form authorizing the DSS to perform a background check on him in connection with Park Place's nursing home license application. The form stated: "I am aware that the Michigan Department of State Police records will be checked for information regarding criminal convictions under authority of the Good Moral Character Statute." J.A. 118.
 
 
 6
 In May 1991, a licensing agent for the DSS, John Vigants, notified Betty Ritsema, the owner and operator of Park Place, that there was a "suitability concern" regarding Courtney and that it was necessary for Courtney to contact him. J.A. 119-20. A Park Place official informed Courtney that he was required to meet with Vigants, but Courtney asserts that he was not told the reason for the meeting. When the two men met, Vigants told Courtney that the DSS was checking his background in order to determine if he was qualified to work in adult foster care and that the DSS was concerned about his criminal record.[1] Courtney explained his criminal history to Vigants, and Vigants told Courtney that "he would 'get back' with him." J.A. 27. Courtney states that no record was made of the meeting. After the meeting, Vigants prepared an Administrative Review Team ("ART") Review Summary, which detailed Courtney's criminal history and concluded that Courtney's record could not be considered decisive evidence that he lacked good moral character. Vigants recommended that no action be taken against park Place or its license. Vigant's supervisor reviewed the form and concurred in Vigant's recommendation. He also prepared an ART Review Summary that reached the same conclusion. Both documents were forwarded to the administrative review team, which consisted of the three individual defendants: Bee, Quigley, and DeWolf.
 
 
 7
 On June 27, 1991, defendants conducted a review of Park Place's license application. Defendants determined that Courtney lacked the good moral character necessary to be employed by Park Place as a nurses' aide.[2] No evidence was submitted at the meeting, nor were any records kept of the proceedings. Defendants did not offer any explanation for their decision. Furthermore, Courtney was not advised of the meeting, the identity of the individuals who conducted the meeting, or the board's final decision.
 
 
 8
 As a result of the decision, a warning letter was mailed to Park Place, dated July 17, 1991, warning that Courtney's criminal history was "deemed to be evidence of the lack of good moral character." J.A. 56. The letter told Park Place that in order to avoid revocation of its license, it had to choose between two options. It could fire Courtney or transfer him to a non-resident care position. After receiving this letter, Park Place terminated Courtney's employment. He was informed of his termination orally, without explanation. Courtney's efforts to obtain an explanation were met with resistance by Park Place officials, who refused to talk to him. Courtney was eventually told that an explanation would be left on the office door. Park Place officials then placed the July 17, 1991 warning letter on the door for Courtney to read.
 
 
 9
 Ritsema stated in an affidavit that the manager of the facility at the time Courtney was terminated was unavailable and that she could not determine why Courtney was fired. However, she stated that it was Park Place's policy to terminate the employment of anyone who had been dishonest about his criminal record on a job application. Courtney testified that he contacted Ritsema to ask about his termination and that she told him she had no complaints about his work but that the matter was out of her hands.
 
 
 10
 Courtney requested a second meeting with Vigants. At that meeting, Vigants told Courtney that he and his supervisor had recommended that no action be taken that was unfavorable to Courtney or Park Place. Although Courtney requested the names of the persons on the review board, Vigants refused to divulge the names, and moreover, failed to advise Courtney of what actions he might take to challenge the decision.
 
 B.
 
 11
 Plaintiffs instituted this action on August 24, 1992, alleging that defendants had deprived Courtney of his property, namely, his employment, without due process of law, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States as well as 42 U.S.C. Sec. 1983. On September 24, 1992, defendant Michigan DSS filed a motion to dismiss pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6). The district court granted the motion as to the defendant state agency on Eleventh Amendment grounds. However, the district court refused to dismiss the action as to the three individual defendants. Plaintiffs and the remaining defendants subsequently filed motions for summary judgment. On May 18, 1994, the district court granted defendants' motion for summary judgment and denied plaintiffs' motion. This timely appeal followed.
 
 II.
 A.
 
 12
 Plaintiffs argue that the district court erred in granting defendants' motion for summary judgment on the ground that Courtney lacked a property interest in his employment at Park Place. Plaintiffs assert that Courtney had a valid property interest in his employment and that his employment would have continued but for defendants' interference. Furthermore, plaintiffs argue that in reaching its decision, the district court failed to apply the proper standards for summary judgment.[3]
 
 
 13
 We review a district court's grant of summary judgment de novo. Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994). Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, LaPointe, 8 F.3d at 378, which may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential elements of its case, Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1389 (6th Cir. 1993) (per curiam). In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., 8 F.3d 335, 339-40 (6th Cir. 1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). See generally Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir. 1989).
 
 
 14
 In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."' Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993) (quoting Anderson, 477 U.S. at 251-52). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 112 S. Ct. 2072, 2077 (1992).[4] However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Adams, 31 F.3d at 384.
 
 
 15
 In order to state a claim for a violation of 42 U.S.C. Sec. 1983, plaintiffs must establish two elements: (1) that defendants acted under color of state law and (2) that defendants deprived them of a federal statutory or constitutional right. Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994); United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 33 (6th Cir. 1992) (per curiam). Defendants do not challenge plaintiffs' assertion that they acted under color of state law but argue instead that plaintiffs were not deprived of due process because Courtney did not have a property interest in continued employment at Park Place. Although plaintiffs counter that Courtney did have a property right in his employment, they fail to demonstrate the basis for this claim. Plaintiffs demonstrate nothing more than the fact of employment and argue that this fact alone created an interest entitling them to due process of law.
 
 
 16
 "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). Thus, plaintiffs cannot successfully assert that their due process rights have been violated unless they can first establish a property interest in Courtney's continued employment at Park Place. Mertik v. Blalock, 983 F.2d 1353, 1359 (6th Cir. 1993); Harper v. Secretary of Health and Human Servs., 978 F.2d 260, 263 (6th Cir. 1992) (per curiam).
 
 
 17
 "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577. Both formal agreements and those that are "'implied from "the [defendants'] words and conduct in the light of the surrounding circumstances"' may be sufficient to constitute a protected property interest." Woolsey v. Hunt, 932 F.2d 555, 564 (6th Cir.) (quoting Perry v. Sindermann, 408 U.S 593, 602 (1972) (alteration in original)), cert. denied, 502 U.S. 867 (1991). However, whether an agreement is sufficient to create a protected interest depends on state law. In Bishop v. Wood, 426 U.S. 341 (1976), the Supreme Court recognized that "[a] property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." Bishop, 426 U.S. at 344 (footnotes omitted); see Parham v. Hardaway, 555 F.2d 139, 141 (6th Cir. 1977). In this case, we look to Michigan law to resolve plaintiffs' claim of entitlement.
 
 
 18
 Numerous cases have held that, in the public sector, an at-will employee has no property interest in continued employment as long as the position is held "at the will of the employee's superiors and the employee has not been promised termination only for just cause."[5] Manning v. City of Hazel Park, 509 N.W.2d 874, 878-79 (Mich. Ct. App. 1993), appeal dismissed, 521 N.W.2d 610 (Mich. 1994); Chilingirian v. Boris, 882 F.2d 200, 203 (6th Cir. 1989); see also Bleeker v. Dukakis, 665 F.2d 401, 403 (1st Cir. 1981) ("This lack of any reasonable expectation of continued employment suffices to establish the lack of 'property' in the constitutional sense, and hence the lack of a viable due process claim."). In Michigan, "[a]ny right to continued employment enjoyed by an employee of a private employer arises out of the employment contract. Such contractual rights do not rise to the level of a protected property interest." Garner v. Michigan State Univ., 462 N.W.2d 832, 836 (Mich. Ct. App. 1990), appeal denied, 439 Mich. 881 (1991). To establish a property interest, "a party must present sufficient proof of either a contractual provision for a definite term or a provision forbidding discharge in the absence of just cause." Manning, 509 N.W.2d at 878; see McLaurin v. Fischer, 768 F.2d 98, 102-03 (6th Cir. 1985).
 
 
 19
 The employment agreement Courtney signed clearly made him an at-will employee, hired for an indefinite duration. The agreement specifically stated that Courtney could be fired "without cause and without notice at any time." J.A. 102. Plaintiffs have presented no evidence contradicting this fact. Moreover, plaintiffs have not shown that Courtney had a special agreement with Park Place or its manager or that he received any promises beyond those embodied in the agreement. Therefore, Courtney has not shown a legitimate claim of entitlement to continuing employment at Park Place. While he may have expected his employment to continue indefinitely, "[a] 'unilateral expectation' does not create a property interest." Duncan v. City of Oneida, 735 F.2d 998, 1000 (6th Cir. 1984); see Spruytte v. Walters, 753 F.2d 498, 506 (6th Cir. 1985), cert. denied, 474 U.S. 1054 (1986). Because Courtney had no property interest in his employment, due process considerations do not apply. See Bishop, 426 U.S. at 347.
 
 B.
 
 20
 Plaintiffs also argue that defendants' actions deprived Courtney of due process in violation of his protected liberty interest in avoiding defendants' uncontested determination that he lacked good moral character.[6] Plaintiffs assert that the manner in which defendants determined that Courtney possessed poor moral character and the method by which their decision was communicated to Park Place produced sufficient stigma to amount to a deprivation of Courtney's liberty interests. Because this issue involves a challenge to the district court's grant of defendants' motion for summary judgment, we shall apply the standards of review set forth in Section II.A. and consider the district court's decision on this issue de novo. Adams, 31 F.3d at 378.
 
 
 21
 As the district court noted in its opinion granting defendants' motion for summary judgment, "[i]njury to reputation, standing alone, is not a liberty interest protected by the Fourteenth Amendment." Mertik, 983 F.2d at 1362 (citing Paul v. Davis, 424 U.S. 693, 708-09 (1976)). Instead, an actionable liberty interest is present in situations "involving termination of government employment or the loss of a legal right or status previously enjoyed under state or federal law." Id. Thus, "when a plaintiff alleges the loss, infringement or denial of a government right or benefit previously enjoyed by him, coupled with communications by government officials having a stigmatizing effect, a claim for deprivation of liberty without due process will lie." Id.; see Naegele Outdoor Advertising Co. of Louisville v. Moulton, 773 F.2d 692, 702 (6th Cir. 1985), cert. denied, 475 U.S. 1121 (1986). In addition, the loss about which the plaintiff complains must occur at the same time as the stigmatizing communications by government officials. See Siegert v. Gilley, 500 U.S. 226, 234 (1991).
 
 
 22
 We have already concluded that plaintiffs cannot demonstrate the presence of a property interest in Courtney's continued employment at Park Place. See Windsor v. The Tennessean, 719 F.2d 155, 159 (6th Cir. 1983) (finding no property right where the employer maintained unconditional power to remove an employee from his position), cert. denied, 469 U.S. 826 (1984). Furthermore, Michigan law does not offer any protection for Courtney's reputation beyond that available under traditional principles of tort law. Paul, 424 U.S. at 711-12; Sullivan v. Brown, 544 F.2d 279, 283-84 (6th Cir. 1976). Therefore, plaintiffs cannot show how defendants' actions have deprived Courtney of a right or benefit to which he was entitled under state or federal law. In the absence of evidence establishing a property interest or other guaranteed benefit, plaintiffs' claim must be viewed as resting on an interest in reputation alone, which we concluded in Mertik, 983 F.2d at 1362, is not a liberty interest worthy of constitutional protection.[7]
 
 
 23
 Courtney had admittedly been convicted of at least two felony charges prior to his employment at Park Place. He has conceded that he lied about his criminal record on his employment application. In light of these known facts, plaintiffs have failed to indicate how they can rebut the truthfulness of defendants' determination of character.[8] In addition, good moral character is defined in Mich. Comp. Laws Sec. 338.41(1) as "the propensity on the part of the person to serve the public in the licensed area in a fair, honest, and open manner." Because Courtney lied on his employment application, it is unlikely that the review board could rationally conclude that Courtney would behave honestly and with the requisite openness.
 
 
 24
 Finally, we are mindful of the Supreme Court's admonition that "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error." Bishop, 426 U.S. at 349-50 (footnote omitted). Moreover, "[s]ection 1983 merely secures the federally protected rights a plaintiff already holds. It does not expand those rights." Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 980 F.2d 382, 387 (6th Cir. 1992). Accordingly, we conclude that the district court was correct in finding that Courtney was not deprived of due process on the basis of a property right in continued employment at Park Place, or on the basis of a liberty interest in avoiding defendants' decision regarding his moral character.
 
 C.
 
 25
 Finally, plaintiffs argue that the district court erred in denying their motion for summary judgment because Courtney had a protected property interest in his continued employment at Park Place and a liberty interest in avoiding defendants' determination that he lacked good moral character. Plaintiffs argue that the manner in which defendants acted lacked adequate pre- or post-deprivation process and amounted to a taking of Courtney's property and liberty without due process of law. Since we have already concluded that the district court's grant of summary judgment in favor of defendants was proper, we find it unnecessary to address this issue.
 
 III.
 
 26
 For the reasons stated, the district court's grant of summary judgment to defendants is AFFIRMED.
 
 
 
 *
 Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 A criminal record check revealed that in 1985, Courtney was convicted on a charge of distributing LSD, for which he received a sentence of three and one-half to seven years. Courtney served approximately two years of the sentence before being paroled in December 1987. Courtney also had three convictions for driving under the influence. After his third conviction in 1985, Courtney was sentenced to a term of imprisonment that ran concurrently with his imprisonment on the drug charge
 
 
 [2]
 The inquiry into Courtney's moral character was presumably undertaken pursuant to Mich. Comp. Laws Sec. 400.713, which, at the time of the review, stated that "[t]he department [of social services] shall issue or renew a license if satisfied as to all of the following: ... (c) The good moral character of the applicant, or owners, partners, or directors of the facility ... (e) The good moral character of the person responsible for the daily operations of the facility." Mich. Comp. Laws Sec. 400.713(3). This statute has subsequently been amended to add employees to the list of persons who must be of good moral character, although such consideration was implicitly recognized prior to the time of the amendment
 In addition, Rule 302(3) of the Licensing Rules for Adult Foster Care Large Group Facilities requires staff participating in resident care activities to be of good moral character.
 
 
 [3]
 Plaintiffs assert that the district court failed to treat their statements with indulgence and that the district court erred in making inferences in favor of defendants. Specifically, plaintiffs argue that the district court overlooked testimony by Courtney that Ritsema told him that the decision to terminate him was out of her hands and that the district court, by setting forth only Ritsema's testimony about Park Place's policy of terminating employees who lie on their applications, created an inference that Courtney was subject to dismissal and would have been dismissed regardless of defendants' actions. Plaintiffs also find error in the district court's failure to include in its discussion certain statements Vigants made to Courtney. We cannot conceive how this evidence would change the conclusion reached by the district court. Moreover, because we review the grant of summary judgment de novo, we need not directly address plaintiffs' arguments regarding the district court's application of the standards for summary judgment. It is sufficient that this court applies the proper standards
 
 
 [4]
 Plaintiffs place great emphasis on Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962), in which we stated: "[T]he papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." We believe that the approach we have set forth, wherein we view all evidence and draw all inferences in favor of the nonmoving party, is fully consistent with this directive. See Tee-Pak, Inc, v. St. Regis Paper Co., 491 F.2d 1193, 1195 (6th Cir. 1974)
 
 
 [5]
 Courtney was an employee of a private care facility and was thus a private sector employee. However, as the district court noted, plaintiffs produced no authority suggesting that employees in the private sector enjoy greater rights than those in public employment
 
 
 [6]
 Defendants argue that we should not consider this issue because plaintiffs did not assert a liberty interest in their complaint. Defendants state that plaintiffs raised the issue for the first time in their brief in opposition to defendants' motion for summary judgment. However, we conclude that because the district court reached the issue, it is now properly before this court
 
 
 [7]
 Plaintiffs attempt to rely on this court's language in Burkhart v. Randles, 764 F.2d 1196 (6th Cir. 1985), in which we stated:
 It is well established that a person's reputation and good name are among the liberty interests protected by the due process clause of the fourteenth amendment from damage by public government action in connection with a termination of employment or refusal to rehire.... [W]here a nontenured employee shows he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name.
 Burkhart, 764 F.2d at 1201 (citations omitted); see also Roth, 408 U.S. at 573. However, in order for plaintiffs to come under the holding in Burkhart, they were required to either establish a property interest in Courtney's employment prior to the time of defendants' publication of the allegedly stigmatizing statements or demonstrate the falsity of the statements. Plaintiffs have failed to meet either of these burdens.
 
 
 [8]
 Plaintiffs argue that the district court erred by relying on the fact of Courtney's felony convictions to buttress its conclusion that plaintiffs had failed to raise a material issue as to the falsity of defendants' allegedly stigmatizing statements. Plaintiffs assert that Mich. Comp. Laws Sec. 338.41 et seq., and Bureau of Regulatory Services Memorandum 88-01, establish a statutory scheme for "good moral character" determinations and that the intent of these statutes and regulations is to promote the "reformation of convicts." Appellant's Brief at 28, 32. Thus, plaintiffs argue that the fact of conviction alone cannot lead to a finding of poor moral character. We conclude that the district court did not rely solely on the fact of Courtney's convictions to find that plaintiffs' assertion of a liberty interest lacked merit. Furthermore, it was plaintiffs' burden to produce evidence raising a genuine issue of fact as to whether the statements made by defendants were false. Plaintiffs failed to produce such evidence, and the district court could look only at the evidence before it, namely, the undisputed fact that Courtney was a twice-convicted felon and the fact that Courtney lied on his employment application
 In addition, we note that although Mich. Comp. Laws Sec. 338.42 provides that a judgment of guilt in a prosecution may not, standing on its own, be used as proof of the lack of good moral character, the statute does not preclude licensing examiners from analyzing the nature of an examinee's conviction and its relationship to the position sought by the examinee. In that way, Courtney's criminal record could have been relevant to the determination of moral character.