**LRL PROPERTIES, et al.,
Plaintiffs–Appellants,**

v.

**PORTAGE METRO HOUSING AUTHORITY, et al., Defendants–Appellees.**

No. 93–3456.

United States Court of Appeals, Sixth Circuit.

Argued May 6, 1994.

Decided May 25, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied
July 6, 1995.

---

Steven H. Steinglass (argued), Cleveland, OH, Stanley S. Keller, President (briefed), Keller & Curtin, C. David Witt (briefed), C. David Witt & Associates, Cleveland, OH, for plaintiffs-appellants LRL Properties, LRL Properties, II, Ltd., Melvin Ross.

R. Todd Hunt (argued), John H. Gibbon (briefed), Walter, Haverfield, Buescher & Chockley, Cleveland, OH, Antonios C. Scavdis, DelGuzzi & Scavdis, Ravenna, OH, for defendants-appellees Portage Metropolitan Housing Authority, et al.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

BATCHELDER, J., delivered the opinion of the court, in which RYAN, J., joined. JONES, J. (pp. 1112–1118), delivered a separate dissenting opinion.

BATCHELDER, Circuit Judge.

Plaintiffs LRL Properties, LRL Properties II, Ltd., and Melvin S. Ross, a general partner of LRL and LRL II, filed a complaint on October 21, 1992, alleging claims under 42 U.S.C. § 1983 and supplemental state claims of defamation and tortious interference with business relationships. The complaint named eight defendants, including the Portage Metropolitan Housing Authority (PMHA), and the PMHA's executive director, a program administrator, and its five board members at the time of the filing of the suit.

Defendants filed a Fed.R.Civ.P. 12(b)(6) motion to dismiss plaintiffs' complaint and plaintiffs moved for leave to file a First Amended Complaint. The district court expressly denied plaintiffs' motion for leave to amend their complaint and granted defendants' motion, dismissing each of plaintiffs' federal claims and dismissing, without prejudice, plaintiffs' state claims. For the reasons that follow, we affirm.

## I.

### A.

Because this case was dismissed on a Rule 12(b)(6) motion, "[t]his Court must construe

the complaint in the light most favorable to the plaintiff[s], accept all factual allegations as true, and determine whether the plaintiff[s] undoubtedly can prove no set of facts in support of [their] claims that would entitle [them] to relief." *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993); *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). And since the district court denied plaintiffs' motion to file an amended complaint, we review both the complaint and the proposed amended complaint for purposes of construing the facts.

Plaintiffs LRL and LRL II are Ohio partnerships organized in part for the purpose of owning and operating an apartment complex ("Kenwood Courts") in the City of Kent, Ohio. Plaintiff Melvin Ross is a general partner of both LRL entities. Kenwood Courts, a large-scale low-income housing project, consists of 216 apartments in Phase I, owned by LRL, and 228 apartments in Phase II, owned by LRL II. Through a variety of subsidy programs, Kenwood Courts is able to charge its tenants below market-rate rent; it looks to the government to make up the difference between rents collected and operating expenses. In Portage County, the primary conduit for housing subsidies is the PMHA.

Defendant PMHA is a political subdivision of the State of Ohio with the authority and duty to administer low-income housing programs in Portage County, Ohio, and specifically, as an agent of the Department of Housing and Urban Development (HUD), to administer federal Section 8 housing programs in Portage County. Defendant Anderson is Executive Director of the PMHA. Defendant Smith is the Director of the Section 8 Department at the PMHA. Defendants Durst, Davison, Antognoli, Sicura, and Crews are or were members of the Board of Commissioners of PMHA during the time relevant to the claims asserted.

Plaintiffs allege that since at least 1985, the PMHA has pursued a political and/or economic objective of replacing the existing management and ownership of Kenwood Courts with alternative ownership and management, either by the PMHA or by those with whom defendants have a favored or preferred relationship. Further, plaintiffs allege that in pursuing this goal the defendants have violated plaintiffs' procedural and substantive due process rights, have treated plaintiffs differently from similarly situated persons, have defamed plaintiffs, and have tortiously interfered with plaintiffs' business interests.

**B.**

In 1985 and 1986, plaintiffs received a HUD Section 8 rent subsidy for 129 units in Phase II of Kenwood Courts. In early 1987, the PMHA offered to purchase Kenwood Courts from the plaintiffs for $8,000,000, but the City of Kent refused to enter into a Cooperation Agreement, a prerequisite to the purchase. Later in 1987, plaintiffs entered into an option agreement to sell Kenwood Courts to a private development entity known as Renaissance Village Ltd. Partnership ("RVLP") for $7,000,000.

In 1988 and 1989, the PMHA, over the course of thirteen months, awarded 191 units of Section 8 Moderate Rehabilitation Rental Assistance to RVLP for the purpose of renovating Kenwood Courts. Plaintiffs do not allege that during this thirteen month period they applied for any Section 8 rehabilitation funds.

In late 1989, it became apparent that the RVLP proposal was no longer feasible. In August, 1990, RVLP was declared in default of its agreement with the PMHA Board. According to plaintiffs, when it became apparent to PMHA that the RVLP proposal was no longer viable, defendants pursued a number of alternative strategies in furtherance of their goal to replace existing ownership of Kenwood Courts. Plaintiffs assert that the defendants proposed converting the Section 8 Moderate Rehabilitation Assistance to other forms of assistance that only PMHA could utilize to the exclusion of plaintiffs and other property owners. Plaintiffs further contend that defendants proposed a secret joint venture with RVLP wherein PMHA would, through a related non-profit organization, purchase Phase II of Kenwood Courts at a depressed price. According to plaintiffs, the only proposal the defendants did not

seriously consider was permitting plaintiffs to benefit directly from the Section 8 program.

Plaintiffs also assert that in an effort to damage and impugn the reputation of plaintiffs and to force alternative ownership at Kenwood Courts, defendants made a number of malicious and knowingly false communications. According to plaintiffs, on June 28, 1989, defendant Anderson sent copies of a letter to HUD, indicating that more than 60 units had been terminated from Section 8 assistance at Kenwood Courts for failure to meet housing standards. Also in June 1989, Anderson wrote to HUD claiming that Kenwood Courts was deteriorating. This, according to plaintiffs, was a campaign of "defamation and innuendo."

Plaintiffs also allege that defendant Smith intentionally refused to give plaintiffs requisite rent increases in the Section 8 Program, increases to which plaintiffs were entitled under the terms of the United States Code of Federal Regulations. Plaintiffs allege that this occurred three times—in or around April 1988, in or around March 1989, and in or around July 1990.

Further, plaintiffs assert that defendants embarked upon a campaign of arbitrary and capricious enforcement of housing quality standards relating to the Section 8 Existing Housing Program. Plaintiffs complain that defendant Smith and his housing inspectors imposed their own arbitrary standards, invented violations, and held plaintiffs to a more rigorous standard than other similarly situated property owners. Plaintiffs also claim that defendants weakened plaintiffs' financial standing by providing their tenants with alternative financing assistance for rental housing and encouraging the tenants to move elsewhere, all in violation of HUD regulations.

On September 1, 1990, in the wake of RVLP's failure, the PMHA readvertised for applications for participation in the Section 8 Moderate Rehabilitation Program. Plaintiffs allege that even prior to readvertisement defendants had decided that if plaintiffs applied, their application would be rejected. Plaintiffs did submit an application for Moderate Rehabilitation assistance, but only for Phase I of Kenwood Courts.

Pursuant to federal regulation, PMHA established procedures for processing the proposals for Moderate Rehabilitation assistance. Proposals were to be screened for completeness, for evidence indicating that there would be no permanent displacement of tenants, for preliminary verification of tenant eligibility, and for evidence that the existing rent was below the Moderate Rehabilitation Fair Market Rent. According to plaintiffs, these criteria constituted a threshold. Developers submitting proposals failing to meet these criteria would be notified; remaining proposals would then be ranked. These remaining proposals, that is, those that had met the threshold requirements, would be entitled to participate in the Section 8 Moderate Rehabilitation Assistance funds. Plaintiffs contend that the purpose of the ranking was simply to determine the order of priority among the competitors and that once ranked, all participants were entitled to assistance, at least to the extent that funds remained in the Section 8 allocation from HUD and until any project was determined financially unfeasible. According to plaintiffs, the PMHA abandoned its specific procedures in contravention of the law, regulations, and its own internal policies in order to assure that plaintiffs would not receive assistance.

The PMHA received three proposals in addition to plaintiffs': (1) Portage Area Development Corporation for 68 units of assistance; (2) Frank S. Polichena for 4 units; and (3) Associated Estates Corporation (AEC) for 191 units in connection with their proposed purchase of Kenwood Courts from plaintiffs. The PMHA awarded Portage Development 68 units and Mr. Polichena 4 units, and requested additional information from AEC, plaintiffs' proposed purchaser of the property, before any further action could be taken.[1]

---

1. Plaintiffs do not indicate in their pleadings or briefs how much of Kenwood Courts AEC proposed to purchase from plaintiffs or whether the proposals of AEC and plaintiffs were for the same units.

On October 22, 1990, the PMHA Board rejected plaintiffs' proposal on the basis of "low ranking," citing as reasons for the rejection "insufficient rehabilitation costs proposed, compared to HUD's required list of work items and established costs and compared to other proposals," and "lack of verifiable rehabilitation specifications and financing for the neighboring property, i.e., Phase II and the questionable feasibility of the project."

Plaintiffs claim that these proffered reasons for rejection are a fabrication since it is not until later in the PMHA's procedures that the rehabilitation cost and final feasibility are determined. Further, plaintiffs claim that the "estimated" costs used in their application were practically identical to those previously verified in connection with the RVLP proposal, and that the PMHA approved the application of Mr. Polichena, which did not include any cost information. Plaintiffs also note that the condition or rehabilitation of neighboring properties was not listed as a condition of approval and that other applications were not subject to the same conditions.

According to plaintiffs, the defendants subsequently changed their story regarding the reasons for rejection, contending that LRL failed to meet its initial screening criteria even though (1) the defendants had already stated the proposal was ranked; (2) the rehabilitation cost and the "other concerns" cited were not part of the initial screening criteria; (3) the plaintiffs were not notified that they did not meet the initial screening criteria as required by defendants' procedures; and (4) the plaintiffs did, in fact, meet the initial screening criteria.

On October 23, 1990, defendants notified the plaintiffs that they could request reconsideration of defendants' rejection of their proposal for the reasons stated above. Plaintiffs requested reconsideration and met with defendants Anderson and Smith at which time they were given the opportunity to clarify their proposal and were advised that they would have a further avenue of appeal to the Board of Commissioners. However, Anderson subsequently notified plaintiffs that their proposal did not meet the initial screening criteria and that they would not have any further right of appeal, but that they could meet with the PMHA Board if they chose. That meeting was scheduled, but after plaintiffs requested that the date be changed, Anderson advised them that they would not be permitted to meet with the Board. This suit was filed October 21, 1992.

## II.

The plaintiffs raise numerous claims of error on appeal. First, they argue that in deciding the motion to dismiss, the district court applied a higher standard of scrutiny to their complaint than permitted under the federal rules. Second, plaintiffs claim that the district court improperly denied their motion to file an amended complaint. Third, plaintiffs argue that the district court used the incorrect statute of limitations in determining that the bulk of their allegations were time-barred. Finally, plaintiffs contend that the district court erroneously concluded that plaintiffs failed to state substantive and procedural due process claims and an equal protection claim for which relief could be granted.

## A.

Whether a district court correctly dismisses a suit pursuant to Fed.R.Civ.P. 12(b)(6) is a question of law subject to *de novo* review. *Taxpayers United for Assessment Cuts v. Austin,* 994 F.2d 291, 296 (6th Cir.1993); *DeLorean Motor Co.,* 991 F.2d at 1239–40. Though this is a liberal standard of review, it requires more than the bare assertion of legal conclusions. *DeLorean Motor Co.,* 991 F.2d at 1240. " 'In practice, "a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." ' " *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984) (quoting *In re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981), *cert. dismissed,* 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983)), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)). And, this Court "need not accept as true legal conclusions or unwarranted factual

**1104**

inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

■ It is plaintiffs' contention that the district court ignored the expansive interpretation given to pleadings for purposes of Rule 12(b)(6) motions and instead imposed a higher standard of pleading than is permitted by the law. Plaintiffs cite *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* — U.S. —, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), in which a district court in Texas had ordered § 1983 claims dismissed "because they failed to meet the 'heightened pleading standard' required by the decisional law of the Court of Appeals for the Fifth Circuit." *Id.* at —, 113 S.Ct. at 1161. The Supreme Court concluded:

> We think that it is impossible to square the "heightened pleading standard" applied by the Fifth Circuit in this case with the liberal system of "notice pleading" set up by the Federal Rules. Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief."

*Id.* at —, 113 S.Ct. at 1163. However, plaintiffs point to nothing in the record indicating that the district court either intended to hold or in fact held the defendants to a higher standard; to the contrary, the district court correctly laid out the standard as follows:

> "A complaint should not be dismissed 'unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 [78 S.Ct. 99, 102, 2 L.Ed.2d 80] (1957)).
>
> The sufficiency of a complaint is a question of law. In reviewing the complaint, "[a]ll well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984).

This assignment of error is without merit.

**B.**

■ Plaintiffs next assign as error the district court's denial of leave to file an amended complaint. Denial of leave to file an amended complaint is usually reviewed under an abuse of discretion standard. *See Janikowski v. Bendix Corp.,* 823 F.2d 945, 951 (6th Cir.1987); *Estes v. Kentucky Utils. Co.,* 636 F.2d 1131, 1133 (6th Cir.1980). However, this Court has held, "[w]hen ... the district court has based its decision [to deny leave to amend] on 'a legal conclusion that the amended pleading would not withstand a motion to dismiss,' there is authority that we review such a decision *de novo.*" *Vild v. Visconsi,* 956 F.2d 560, 565 (6th Cir.) (quoting *Martin v. Associated Truck Lines, Inc.,* 801 F.2d 246, 248 (6th Cir.1986)), *cert. denied,* — U.S. —, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992). Among the reasons the district court gave for denying leave to amend the complaint was the fact that the proposed amended complaint does not "cure any of the insufficiencies pointed out as regards plaintiffs' fourteenth amendment due process and equal protection claims." Thus, we review *de novo* the district court's denial of leave to amend.

■ Our *de novo* review leads us to conclude that the district court correctly denied the motion. The additional facts alleged in the amended complaint are primarily an attempt to construct a theory to get around the two-year statute of limitations. In the abuse of discretion context, this Court has held: "Denial of [leave to amend] is not an abuse of discretion where '[t]he infirmities of the original complaint are not dissipated by the amended complaint.'" *Hamilton v. Bean,* 745 F.2d 1034, 1036 (6th Cir.1984) (quoting *Hohensee v. Akron Beacon Journal Publishing Co.,* 277 F.2d 359, 360 (6th Cir.), *cert. denied,* 364 U.S. 914, 81 S.Ct. 277, 5 L.Ed.2d 227 (1960)). Because the infirmities in the original complaint were not cured by the allegations in the amended complaint, the district court properly denied the plaintiffs' motion to amend.

**C.**

The district court held that "the two-year statute of limitations applicable in Section 1983 cases bars any of plaintiffs' claims which occurred before October 21, 1990, two years

prior to the filing date." The plaintiffs assert that this was incorrect and that a four-year statute of limitations is actually the appropriate statute of limitations.

Plaintiffs assert a number theories to buttress their contention that the district court's holding with respect to the statute of limitations was in error. Plaintiffs first claim that the district court applied the incorrect statute of limitations; in the alternative, they assert a "continuing violation" theory, a "continuing conspiracy" theory, and a "discovery" theory.

### 1. Wrong Statute of Limitations

■ The plaintiffs' claim that the district court applied the wrong statute of limitations is meritless. The plaintiffs cite to two Ohio Court of Appeals decisions which hold that Ohio's four-year "residual" statute of limitations is the proper statute of limitations in § 1983 cases. *See Bojac Corp. v. Kutevac,* 64 Ohio App.3d 368, 581 N.E.2d 625, 627 (1990) (holding that Ohio Rev.Code § 2305.09(D) is the "most logical and appropriate [statute of limitations in a § 1983 action] based on the United States Supreme Court holding in *Owens v. Okure* [488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) ]"); *Weethee v. Boso,* 64 Ohio App.3d 532, 582 N.E.2d 19, 21 (1989) (holding Ohio Rev.Code § 2305.09(D) is the appropriate statute of limitations in § 1983 actions). If this Court had not spoken on this issue, these Ohio cases might be persuasive; however this Court, sitting en banc, squarely addressed this issue in *Browning v. Pendleton,* 869 F.2d 989 (6th Cir.1989) (en banc), and definitively held that "the appropriate statute of limita-

tions for 42 U.S.C. § 1983 civil rights actions arising in Ohio ... requires that actions ... be filed within two years after their accrual." *Id.* at 992. On at least one occasion after *Browning* and after the two Ohio Court of Appeals decisions, we have been invited to revisit the issue and have declined to do so. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.,* 926 F.2d 505, 510 (6th Cir.), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991).[2] The district court's application of the two-year limitation period was not erroneous.

### 2. Continuing Violation Theory

■ Next, plaintiffs allege that they have sufficiently pled a continuing violation of their rights such that the statute of limitations should be extended.[3] In *Dixon v. Anderson,* 928 F.2d 212 (6th Cir.1991), this Court explained: "[C]ourts view 'continuing violations' as falling into two categories of 'narrowly limited exceptions' to the usual rule that 'statutes of limitations ... are triggered at the time the alleged discriminatory act occurred.'" *Id.* at 216 (quoting *E.E.O.C. v. Penton Indus. Pub. Co.,* 851 F.2d 835, 837–38 (6th Cir.1988)); *see also Anderson v. City of Bristol,* 6 F.3d 1168, 1174–75 (6th Cir. 1993); *Haithcock v. Frank,* 958 F.2d 671, 677–78 (6th Cir.1992). The first category of continuing violations "arises where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation...." *Dixon,* 928 F.2d at 216. In *Dixon,* this Court explained:

> The rationale underlying this category is that the employer commits an illegal act,

**2.** Even though there might be a good argument for using Ohio Rev.Code § 2305.09(D), instead of Ohio Rev.Code § 2305.10, as the statute of limitations in § 1983 actions, this panel simply cannot so hold. It is the well-settled law of this Circuit that "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Salmi v. Secretary of Health & Human Servs.,* 774 F.2d 685, 689 (6th Cir.1985); *see also Timmreck v. United States,* 577 F.2d 372, 376 n. 15 (6th Cir.1978), *rev'd on other grounds,* 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). This panel cannot overrule another pan-

el of this Court, much less the full Circuit sitting en banc. Therefore, if this Circuit wishes to change its position with respect to the appropriate statute of limitations in § 1983 cases, the full Court must decide to do so.

**3.** Courts have been extremely reluctant to apply this doctrine outside of the context of Title VII. One court has noted, "courts, including this one, are wary to use the continuing violation doctrine to save claims outside the area of Title VII discrimination cases." *McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850, 866 (5th Cir.1993) (citing cases), *cert. denied,* —— U.S. ——, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994).

such as giving unequal pay for equal work, each time the employer dispenses the unequal pay. *Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir.1982). This result follows from the fact that paying unequal wages for equal work is in itself the forbidden discriminatory act. It is irrelevant that the employer has committed the same illegal act at other times prior to the beginning of the relevant limitations period.

*Id.*

The second category of continuing violations arises where there "has occurred 'a longstanding and demonstrable policy of discrimination.'" *Id.* at 217 (quoting *Penton Indus.*, 851 F.2d at 838). "Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing 'over-arching policy of discrimination.'" *Id.* (quoting *Janikowski*, 823 F.2d at 948); *see Haithcock*, 958 F.2d at 678.

No matter how favorably construed, the facts pled by the plaintiffs cannot establish a continuing violation. The plaintiffs are complaining of a series of discrete and separate acts that, at best, are separate incidents of discrimination and are not sufficient, even when the plaintiffs' pleadings are liberally construed, to establish an "over-arching policy of discrimination."

### 3. Continuing Conspiracy Theory

■ Plaintiffs next assert a "continuing conspiracy" theory, relying on *White v. Bloom*, 621 F.2d 276 (8th Cir.1980), *cert. denied*, 449 U.S. 995, 101 S.Ct. 533, 66 L.Ed.2d 292 (1980), *and cert. denied*, 449 U.S. 1089, 101 S.Ct. 882, 66 L.Ed.2d 816 (1981), a pro se criminal case from the Eighth Circuit, which held "[b]ecause it appears this action was filed within three years of the last overt act of what may have been a continuing conspiracy to deprive [defendant] of constitutional rights, we cannot say that any claim stated in the complaint is

barred...." *Id.* at 281. Plaintiffs contend that, construing "the Complaint in a light most favorable to plaintiffs, the pleadings can easily be read to allege the existence of a conspiracy among defendants and such non-defendants as RVLP, the City of Kent, and defendant PMHA's related non-profit corporation." [4]

Reading the complaint and proposed amended complaint in the light most favorable to plaintiffs, we find only two paragraphs that can be read arguably to allege concert of action between the defendants and another party. Paragraphs sixty-six and sixty-seven of the amended complaint read:

66. Among the alternative[s], the Defendant proposed a secret joint venture with RVLP whereby the Defendants, through a related non-profit corporation, would purchase Phase II of Kenwood Courts from LRL II for $2,500,000.00, after which the RVLP would take control of Phase I of Kenwood Courts.

67. On or about May 15, 1990, the PMHA, through a related non-profit corporation, offered to purchase Phase II of Kenwood Courts from LRL II for [$]2,500,000.00. LRL II refused this offer....

Even if these two paragraphs are sufficient to allege a conspiracy, plaintiffs do not allege any other acts in furtherance of the conspiracy or any injury or damage to plaintiffs from this alleged conspiracy that occurred later than May 15, 1990. This Court has rejected the position that "the continuance of a conspiracy beyond the date when injury or damage occurs extends the statute of limitations in a section 1983 action." *McCune v. City of Grand Rapids*, 842 F.2d 903, 906 (6th Cir. 1988) (citing *Compton v. Ide*, 732 F.2d 1429, 1432–33 (9th Cir.1984)). So, even if the "conspiracy" did continue past the May 15, 1990 date, a fact not alleged in the complaint, the statute of limitations would not be extended beyond May 15, 1990, the date of the last

---

4. In *Hull*, this Court adopted the theory that: "It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."

*Hull*, 926 F.2d at 509 (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953)).

overt act of the alleged conspirators. Since the last alleged act of the conspirators occurred in May of 1990, two years and five months before the suit was filed, any claims relating to these allegations are time-barred. In short, we conclude that even giving a very liberal interpretation to the allegations of plaintiffs' complaint, they do not allege a "continuing conspiracy" such that they can get around the two-year statute of limitations.

### 4. Ohio's Discovery Rule

■ Plaintiffs assert that Ohio's "discovery rule" is the third exception to applying the two-year statute of limitations. Citing *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84, 447 N.E.2d 727 (1983), an asbestos case, plaintiffs claim that this rule permits claims to survive the statute of limitations when the existence of the claim is learned sometime after the cause of action arises. However, in *Sevier v. Turner*, 742 F.2d 262 (6th Cir.1984), this Court held that in § 1983 actions, federal law governs the question of when a limitations period begins to run:

> The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.

*Id.* at 273 (citations omitted).

■ At paragraph 105 of their proposed amended complaint, plaintiffs allege that "[p]laintiffs became aware of most of the facts alleged in this Complaint during the spring of 1991, upon uncovering such facts in connection with discovery undertaken during litigation with [RVLP Organizer] Anthony W. Rodriguez."[5]

■ Defendants assert, and we agree, that the plaintiffs were actually aware of most of the alleged acts in this suit, and through due diligence should have been aware of most of the others, before October 21, 1990. Plaintiffs were actually aware of the offers to purchase their property. Plaintiffs knew that their requests for rent increases had been denied, and as owners/managers of this property since 1978, should have endeavored to find out why the rent increases were denied. Their bare assertion that they were unaware of the events underlying their suit is an "unwarranted factual inference" which this Court need not accept. *Morgan*, 829 F.2d at 12.[6]

We agree with the district court's determination that all claims based on acts which allegedly occurred prior to October 21, 1990, are time-barred. Giving the complaint or amended complaint a liberal construction, it does not allege facts sufficient to toll the two-year statute of limitations. Therefore, plaintiffs' allegations regarding the PMHA's offers to purchase plaintiffs' property in early 1987 and May 1990, defendant Smith's failure to grant rent increases to plaintiffs in April 1988, March 1989, and July 1990, the award of Section 8 Moderate Rehabilitation Assistance to RVLP in October 1988, June 1989, and November 1989, defendant Anderson's

---

5. Plaintiffs argue that their mere assertion that they did not have knowledge of the events which are the underpinnings of their claims is sufficient for purposes of a motion to dismiss, and cite in support of this proposition *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Conley* does not support this argument. If a claimant were simply allowed to allege, unchallenged, any date as the time at which the limitations period began to run, courts would be unable to dismiss claims that were, from the record, obviously time-barred.

6. The situation here is similar to the one in *Hoover v. Langston Equipment Associates, Inc.*, 958 F.2d 742 (6th Cir.1992). Though *Hoover* concerned Fed.R.Civ.P. 9(f), and thus had a higher standard of pleading, some of the observations made by the court are persuasive here. In *Hoo-* ver, the district court dismissed the plaintiff's complaint because the limitations period had run, stating " 'this bare assertion of delayed discovery [is] insufficient to prevent the statute of limitations from running.' " *Id.* at 744. This Court observed, "it is not true, when the face of the complaint affirmatively indicates that the time limit for bringing the claim has passed, that plaintiff may escape the statute by saying nothing." *Id.* at 745. This is essentially the case here. Plaintiffs allege that the majority of the acts that are the basis for their suit occurred more than two years prior to its filing. However, their complaint says nothing more than that they did not become aware of these facts until spring 1991. Even under the lower standard of notice pleading required by Rule 8(a), this is insufficient.

alleged defamatory communications to HUD regarding plaintiffs in June, August, and October 1989, and July 1990, defendant Smith's alleged arbitrary enforcement of HUD's housing quality standards in May, 1990, and defendants' urging of residents at Kenwood to move elsewhere by offering them Section 8 certificates, will not be considered in determining whether plaintiffs have stated due process or equal protection claims.

### D.

■ The district court determined that the plaintiffs failed to state either a cognizable liberty or property interest under the Fourteenth Amendment. The district court concluded:

> Plaintiffs have failed to state a claim under the fourteenth amendment due process clause because they have alleged no cognizable liberty or property interest. The complaint itself states that plaintiffs' application for participation in the Section 8 Moderate Rehabilitation Program was rejected, that is, it failed to meet the qualifying requirements. As defendants correctly point out, there is no property interest in a "unilateral desire to participate in a federal program where plaintiffs acknowledge that discretion is vested with the Housing Authority to determine whether the proposal meets the threshold requirements for further consideration."

■ To prevail on its procedural due process claim, the plaintiffs must prove that they had a definite liberty or property interest and that such interest was abridged without appropriate process. *See Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "The process requirement necessary to satisfy fourteenth amendment procedural due process comes into play only after plaintiff has shown that it has a property or liberty interest." *Curtis Ambulance of Fla., Inc. v. Board of County Comm'rs,* 811 F.2d 1371, 1375 (10th Cir. 1987).

The plaintiffs' claim that they have stated a cognizable liberty interest is premised on their claims of defamation, failure to receive rent increases, defendants' inducing of plaintiffs' tenants to breach their lease agree-

ments, restriction of availability of Section 8 housing at plaintiffs' property, arbitrary and capricious inspections by defendants to harass plaintiffs, and denial to plaintiffs of Section 8 Moderate Rehabilitation funds. All of these alleged actions except the last occurred outside of the two-year statute of limitations and therefore cannot be considered.

In defining a liberty interest, the Supreme Court has stated:

> In an attempt to limit and guide interpretation of the [Due Process] Clause, we have insisted not merely that the interest denominated as a "liberty" be "fundamental" ... but also that it be an interest traditionally protected by our society. As we have put it, the Due Process Clause affords only those protections "so rooted in the traditions and conscience of our people as to be ranked as fundamental."

*Michael H. v. Gerald D.,* 491 U.S. 110, 122, 109 S.Ct. 2333, 2341–42, 105 L.Ed.2d 91 (1989) (plurality opinion) (footnote omitted) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), *overruled on other grounds, Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). The plaintiffs' alleged economic injury resulting from the denial of Section 8 Housing funds does not, even for purposes of a Rule 12(b)(6) motion, rise to this level.

■ Plaintiffs also allege that they have a cognizable property interest. To establish a property interest in a particular benefit, the plaintiffs must have a "legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. " '[A]n abstract need or desire for it' or a 'unilateral expectation' is insufficient." *Curtis Ambulance,* 811 F.2d at 1375 (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709).

In support of their contention that they have a cognizable property interest, plaintiffs rely on 24 C.F.R. § 882.504, which sets forth the process that PMHA must follow in awarding Section 8 funds. Section 882.504(c) provides:

> *Selection of Proposals.* After the initial inspection and preliminary feasibility anal-

ysis, the PHA should select among Owner proposals those proposals which it will approve. The PHA must establish a method of selecting among Owner proposals and must make this method known to any Owner submitting or planning to submit a proposal. Proposals must be approved in accordance with criteria established by the PHA and approved by HUD, and in accordance with the following requirements: . . . [7]

24 C.F.R. § 882.504(c) (1990). Section 882.504(d) provides:

*Notification of Owners.* When the PHA has selected the proposals which it plans to approve, the PHA must notify all Owners specifying:

> (1) Whether their proposal has been rejected or approved;
>
> (2) If the proposal was rejected, the reason(s) for rejection and the Owner's right to appeal to the PHA the PHA's basis for rejection.

24 C.F.R. § 882.504(d) (1990).

Pursuant to the federal regulation, the PMHA was required to establish procedures for processing the proposals. As set out in plaintiffs' proposed amended complaint, the procedures established by PMHA included: (1) Submission of Proposals; (2) Initial Screening for (a) completeness, (b) evidence indicating that there will be no permanent displacement of tenants, (c) preliminary verification of tenant eligibility, and (d) evidence that the existing rent is below the Moderate Rehabilitation Fair Market Rent. The PMHA procedures state that proposals not meeting these requirements would be notified; (3) Initial Inspection by the PMHA with the owner and tenant present. In connection with this inspection a preliminary work write-up and cost estimate of repairs, prepared by the owner, would be reviewed with the PMHA staff; (4) Feasibility Analysis–Whereby the PMHA would calculate the rents necessary to support the cost of rehabilitation; (5) Selection of Proposals–Whereby all proposals having gone through the first four steps would be ranked based on a ranking system; (6) Rehabilitation Activities–Whereby after ranking the proposals the PMHA would provide the owners with a list of needed repairs and the owner would obtain three bids to determine the actual costs of rehabilitation; (7) Final Feasibility Analysis–Whereby the rents would be recalculated once the actual rehabilitation cost were [sic] known to determine if the proposal was still financially feasible; (8) an AHAP would be executed; (9) Construction[;] (10) Completion of rehabilitation; (11) Continuing owner responsibilities; and (12) Continuing PMHA responsibilities.

Plaintiffs argue on appeal that, based on the federal and PMHA procedures, there is an initial consideration of the threshold criteria, and

> [t]hose failing to meet the threshold criteria are excluded from further consideration; those meeting the threshold criteria are thereafter ranked to determine not their eligibility, but rather their order of receipt of housing funds. In other words, it is no longer a question of whether; it is a question of when. It is not simply a matter of some abstract desire to participate. Having at this point met the threshold criteria, there is a legitimate claim of entitlement unless and until all available funds have been utilized.

Plaintiffs argue that since defendants first responded that plaintiffs' proposal was rejected for "low ranking," which implies that the plaintiffs met the threshold requirements but were simply ranked low on the totem pole, the defendants' later avowal that the plaintiffs had not met the initial threshold is, if nothing else, a hotly contested matter of fact completely inappropriate for dismissal on a Rule 12(b)(6) motion. Plaintiffs also assert that the fact that an appeal from the rejection of the owners' proposal is specifically provided for in § 882.504(d) is highly probative of the existence of a property right.

---

**7.** These requirements are not the subject of dispute or contention and we therefore do not reproduce them.

The crux of plaintiffs' argument is that once a proposal has made it past the initial four steps in the PMHA procedures, the question is no longer *whether* the owner will receive assistance, but *how much* assistance that owner will receive, and that the owner at that point has a legitimate entitlement to benefits. We think that neither the federal regulation, 24 C.F.R. § 882.504, nor the PMHA procedures mandate this conclusion. The regulation grants to the defendants, within certain limits, the discretion to "establish a method of selecting among Owner proposals." 24 C.F.R. § 882.504(c) (1990). The PMHA's procedures at Step 5 provide: "Selection of Proposals–Whereby all proposals having gone through the first four steps would be ranked based on a ranking system." However, it is clear that the procedures permit a proposal to be rejected at Step 7: "Final Feasibility Analysis–Whereby the rents would be recalculated once the actual rehabilitation cost were [sic] known to determine if the proposal was still financially feasible." The mere fact that the plaintiffs' proposal had been given *some* ranking, albeit a low one, did not vest in plaintiffs any right to the funds; the plaintiffs therefore had no legitimate entitlement to benefits.

This Court has held that "no property interest exists in a procedure itself, without more." *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 34 (6th Cir.1992) (quoting *Curtis Ambulance,* 811 F.2d at 1377). In that case, an insurance company, United of Omaha Life Insurance, was the successful bidder for the provision of administrative services to the State of Michigan. Before the contract was actually awarded, another insurance company persuaded Michigan to change its specifications for selection and to rebid the contract. Prior to completion of the rebidding process, United obtained a preliminary injunction prohibiting Michigan from rebidding the contract, claiming that it had a property interest in certain purchasing guidelines in a booklet entitled "Doing Business with the State of Michigan—A Guide for Vendors," and that Michigan's failure to follow those procedures deprived United of its property interest without due process.

This Court rejected United's claim, holding that

> [a] "disappointed bidder" to a government contract may establish a legitimate claim of entitlement protected by due process by showing either that it was actually awarded the contract at any procedural stage or that local rules limited the discretion of state officials as to whom the contract should be awarded.

*Solomon,* 960 F.2d at 34. We concluded that since United could not make either of these showings, its interest lay in the process alone, and that this interest was not a property interest protected by the due process clause. *Id.* at 35. *See also Silver v. Franklin Township, Board of Zoning Appeals,* 966 F.2d 1031, 1036 (6th Cir.1992) (holding that discretion of zoning board was not sufficiently circumscribed to support substantive due process claim).

Although the case before us is not a "disappointed bidder" case, the analysis is nonetheless appropriate. These plaintiffs cannot show that they were actually awarded the Section 8 funds at any procedural stage or that the relevant federal regulations limited the discretion of the PMHA. Here, all that was required of the PMHA was that it "should select among Owner proposals those proposals which it will approve," that it establish criteria for making that selection, and that it apply those criteria, all of which it did. Plaintiffs' right to the funds never ripened into a legitimate claim of entitlement and the right of appeal is in and of itself no more than a procedure. Therefore, since plaintiffs had no right to the Section 8 funding, denying them a proper appeal, while a violation of the applicable federal regulation, does not create in them a property right which can be vindicated in a § 1983 action.

### E.

 Next, plaintiffs assert that viewed in a light most favorable to them, PMHA's actions in this case are an example of "government run amok, a society of men and not law until called to account before the bar of justice." However, it is clear that under this Circuit's precedents, the plaintiffs have not alleged a substantive due process violation.

In *Mertik v. Blalock,* 983 F.2d 1353 (6th Cir.1993), this Court explained:

> Substantive due process claims are of two types. The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims under "the Fourteenth Amendment simpliciter."
>
> The other type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. The test for substantive due process claims of this type is whether the conduct complained of "shocks the conscience" of the court.

*Id.* at 1367 (citations omitted).

In *Sutton v. Cleveland Board of Education,* 958 F.2d 1339 (6th Cir.1992), this Court specifically addressed the second category of substantive due process rights:

> The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. Its concerns are far narrower, but at the same time, far more important. Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" It protects those interests, some yet to be enumerated, "implicit in the concept of ordered liberty," like personal choice in matters of marriage and the family.

*Id.* at 1350–51 (quoting *Charles v. Baesler,* 910 F.2d 1349, 1353 (6th Cir.1990)); *see also Michael H.,* 491 U.S. at 122, 109 S.Ct. at 2341–42.

Plaintiffs appear to be alleging violations of both categories of substantive due process. Neither claim has merit. The right to participate in a federal housing funds program simply does not rise to the level of a right "so rooted in the traditions and conscience of our people as to be ranked as fundamental," and the actions of defendants alleged in the complaint and proposed amended complaint do not even approach the level of "shocks the conscience."[8] *See Solomon,* 960 F.2d at 35. Therefore, we conclude that there is no set of facts under which the plaintiffs could prove a substantive due process claim.[9]

## F.

 Finally, plaintiffs assert an equal protection claim, alleging that they are part of a "discrete group, i.e., those four persons applying for Section 8 Moderate Rehabilitation Assistance as well as those property owners participating in the Section 8 Existing Housing Program."

The district court concluded:

> Plaintiffs have also failed to allege a claim for relief under the equal protection prong of the due process clause. "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Metropolitan Sewer Dist.,* 922 F.2d 332, 341 (6th Cir. 1990).

In *Booher v. United States Postal Service,* 843 F.2d 943 (6th Cir.1988), this Court held:

> Fatal to [plaintiff's] allegation is the fact that there is no claim that [plaintiff] was victimized because of some suspect classification, which is an essential element of an equal protection claim. Even assuming there was an unjustified action taken against [plaintiff] this single action, without more, cannot form the basis of an equal protection claim. We have previously delineated the difference between a constitutional injury and a common tort action by requiring a showing of suspect classification of a *group:* "The equal protection concept does not duplicate common law tort liability by conflating all persons not injured into a preferred class receiving better treatment than a plaintiff who alleges tortious injury."

---

8. Plaintiffs' heavy reliance on *Wilkerson v. Johnson,* 699 F.2d 325 (6th Cir.1983), is not helpful since the vast majority of the acts which they characterize as motivated by "malice, bias, and self-dealing" are barred from consideration by the two-year statute of limitations.

9. Because we conclude that the district court was correct in its determination that plaintiffs have failed to state a due process claim, we decline to address the issue of the sufficiency of the pleadings with regard to the adequacy of any state remedies.

*Id.* at 944 (quoting *Joyce v. Mavromatis,* 783 F.2d 56, 57 (6th Cir.1986)).

■ Plaintiffs' claim in this case must fail for the same reason. Even if property owners and persons applying for Section 8 Housing funds could be shown to be a discrete class for purposes of the § 1983 action, plaintiffs do not claim that they were denied the funds *because* they are property owners. At best, plaintiffs allege a tort against their business interests. This is simply insufficient to support an equal protection claim and the district court therefore properly dismissed this claim.[10]

## III.

For all of the foregoing reasons, we AFFIRM the district court's dismissal of the plaintiffs' complaint and denial of leave to file an amended complaint.

NATHANIEL R. JONES, Circuit Judge, dissenting.

After considering the decision of my esteemed colleagues, which affirms the district court's dismissal of Plaintiffs' complaint and denial of leave to file an amended complaint, I respectfully dissent for a number of reasons.

### I. Statute of Limitations

First, the majority agreed with the district court's determination that all of the Plaintiffs' section 1983 claims based on acts allegedly occurring prior to October 21, 1990, were time-barred because of the applicable two-year statute of limitations. Maj. Op. at 1107. Although I agree that this court is bound to follow the two-year statute of limitations delineated in *Browning v. Pendleton,* 869 F.2d 989 (6th Cir.1989) (*en banc*), I disagree with the majority's conclusion that all of the Plaintiffs' section 1983 claims, based on acts occurring before October 21, 1990, are time-barred.

10. Plaintiffs assert that *Silver v. Franklin Township, Board of Zoning Appeals,* 966 F.2d 1031 (6th Cir.1992), stands for the proposition that their claim must at least be allowed to go to summary judgment. Plaintiffs are wrong. Simply because the equal protection claim was allowed to survive until the summary judgment stage in that case does not give the plaintiffs a right to continue their claim in this case when, on the face of their complaint, they fail to allege facts that under any legal theory will allow them to recover.

Under the "discovery" doctrine, the limitations period on an injury begins to run only after the plaintiff knows, or through reasonable diligence, should know of his injury. *Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir.1984). The Plaintiffs clearly pleaded that they did not discover their injury until the spring of 1991. *See* J.A. at 105 (Am.Compl. ¶ 105). Because we are obligated to construe the complaint in the light most favorable to the Plaintiffs and accept all factual allegations as true, *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 475 (6th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990), it follows that, at least in this early stage of the litigation, the Plaintiffs' claims pertaining to events occurring prior to October 1990 ought not to be barred by the statute of limitations. If, after discovery, it turns out that the Plaintiffs' allegations of late discovery of injury are insupportable, then the pre-limitations period claims should be barred. Barring them on the basis of the pleadings alone, however, particularly when the Plaintiffs have specifically pleaded late discovery, is premature.

### II. Procedural Due Process

Second, the majority agreed with the district court that the Plaintiffs' procedural due process claims failed because they did not state a cognizable liberty or property interest under the Fourteenth Amendment. Maj. Op. at 1108–1110. The majority correctly noted that the Plaintiffs' liberty interest was "premised on their claims of defamation, failure to receive rent increases, defendants' inducing of plaintiffs' tenants to breach their lease agreements, restriction of availability of Section 8 housing at plaintiffs' property, arbitrary and capricious inspections by defendants to harass plaintiffs, and denial to plaintiffs of Section 8 Moderate Rehabilitation funds." Maj. Op. at 1108. The majority refused to address all but the last of these asserted liberty interests because they occurred outside the two-year statute of limita-

tions. Based on my earlier analysis, I believe the majority erred in not considering all of these alleged liberty interests.

For example, the Plaintiffs contend that PMHA's alleged acts of defamation and tortious interference induced tenants into breaching their leases, thereby resulting in the Plaintiffs' loss of existing contractual rights. In *Mertik v. Blalock*, 983 F.2d 1353, 1362 (6th Cir.1993) (citing *Paul v. Davis*, 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1164–66, 47 L.Ed.2d 405 (1976)) this court held that "when a plaintiff alleges the loss, infringement or denial of a government right or benefit previously enjoyed by him, coupled with communications by government officials having a stigmatizing effect, a claim for deprivation of liberty without due process of law will lie." This is not to say that mere defamation rises to the level of a constitutional claim, for "[i]njury to reputation, standing alone, is not a liberty interest protected by the Fourteenth Amendment." *Id.* (citing *Paul*, 424 U.S. at 708–09, 96 S.Ct. at 1164). In order for defamation by governmental officials to rise to the level of a constitutional cause of action, the defamatory conduct " 'must accompany the alteration of a recognized interest or status created by the state.' " *Id.* (quoting *Naegele Outdoor Advertising Co. v. Moulton*, 773 F.2d 692, 702 (6th Cir.1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986)). Thus, if the Plaintiffs could show that these contractual rights were created by the state rather than by private contract, this would suffice to show a liberty interest under *Mertik*. It is not clear from the record, at this early stage of the litigation, whether the contracts that were allegedly breached were created by the state such that they were constitutionally protected. Viewing the pleadings in the light most favorable to the Plaintiffs, it follows that dismissal of this claim was premature.

Regarding a property interest, the Plaintiffs alleged that based on federal and PMHA procedures, they were entitled to receive HUD funds. " 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expecta-

tion of it. He must, instead, have a legitimate claim of entitlement to it.' " *Mertik*, 983 F.2d at 1359 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Furthermore, one has no constitutionally protected property interest in procedure in and of itself. *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir.1992). In order for a "disappointed bidder" to show a legitimate claim of entitlement, then, it is not enough for the bidder to show merely that procedures were violated; the bidder must also show either that the contract was actually awarded to the bidder, or that "local rules limited the discretion of state officials as to whom the contract should be awarded." *Id.*

The Plaintiffs assert that PMHA's initial screening procedures provided a mechanical decision-making procedure that, properly applied, left PMHA with little or no discretion as to which applicant would receive HUD funds. The Plaintiffs argue that the feasibility analysis and ranking are later steps not reached if the initial screening criteria are not met. Moreover, the Plaintiffs allege that PMHA implicitly told them that they passed the initial screening when PMHA failed to notify them otherwise and told them that they received a low ranking, insofar as failure to pass the initial screening would result in no ranking at all. Further, the Plaintiffs assert that the right to an appeal—which was allegedly denied by PMHA—implies that HUD intended to limit discretion and that HUD believed a bidder's interests warranted protection. Finally, the Plaintiffs contend that they have other property interests arising from existing contracts with PMHA and HUD, and that these interests are burdened by PMHA's alleged violations.

After reviewing the Plaintiffs' complaint, it is clear that they alleged that PMHA failed to follow its own procedures, but it is not clear whether these procedures protect and give rise to an independent property interest. Unanswered questions remain. How much discretion did PMHA really have under these procedures? How was ranking accomplished? Do any rights attach to the mere passing of the initial screening? What is the effect of PMHA's alleged violations on the

Plaintiffs' other alleged legitimate claims of entitlement? The record provides no basis upon which to answer these questions. Again, viewing the pleadings in the light most favorable to the Plaintiffs, it follows that the granting of the motion to dismiss on this particular ground was premature.

The district court agreed with PMHA that, in accordance with *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), even if the Plaintiffs had sufficiently alleged a liberty or property interest, the availability of postdeprivation procedures under Ohio law sufficed to provide them with due process. Because the majority, on appeal, did not find a liberty or property interest, they did not address the adequacy of state remedies, but given the district court's conclusion, I shall proceed to do so.

In *Parratt,* the Court held that where a state actor negligently deprives an inmate of his property, postdeprivation remedies made available by the state can satisfy the requirements of procedural due process. 451 U.S. at 537–38, 101 S.Ct. at 1913–14.[1] In *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), however, the Court clarified that the Constitution usually requires procedural protections *preceding* the complained-of deprivation and that postdeprivation procedures are usually inadequate to protect due process rights. 494 U.S. at 127–28, 110 S.Ct. at 984–85. Under the facts presented in *Parratt,* however, "postdeprivation tort remedies [were] all the process that [was] due, simply because they [were] the only remedies the State could be expected to provide." *Id.* at 128, 110 S.Ct. at 985. The Court pointed out that in *Parratt,* the particular deprivation that was at issue—a prison employee negligently lost a prisoner's property—was unforeseeable. *Id.* at 129, 136, 110 S.Ct. at 985, 989. Thus, it could not have been prevented by any possible predeprivation procedural safeguard; "the very nature of the deprivation made predeprivation process 'impossible.'" *Id.* at 129, 137, 110 S.Ct. at 985, 989. Further, in *Parratt,* the state actor's conduct was unauthorized, not in the

sense that it was an abuse of authority, but rather in the sense that the state actor was acting entirely without authority. *Id.* at 138, 110 S.Ct. at 990.

Construing *Zinermon,* the Sixth Circuit has held that:

> Cases in which a due process challenge is made to deprivations resulting from the enforcement of an established state procedure stand in sharp contrast to *Parratt.* ... In such cases, the actions at issue are not random or unauthorized, and it is both practical and feasible for the state to provide pre-deprivation process to the aggrieved party. A § 1983 plaintiff making this type of claim need not plead or prove the inadequacy of state remedies.

*Mertik,* 983 F.2d at 1365 (citing *Macene v. MJW, Inc.,* 951 F.2d 700, 706 (6th Cir.1991)). The *Mertik* court held that, where the plaintiff pleaded that the deprivations of which she complained were neither random nor unauthorized, and that predeprivation procedures were feasible and practicable, the lower court erred in granting a Rule 12(b)(6) motion to dismiss pursuant to *Parratt,* on the ground that postdeprivation state remedies were available. *Id.* at 1367.

In the present case, the deprivations allegedly suffered by the Plaintiffs were foreseeable, the alleged conduct of PMHA was intentional, and it constituted an abuse of authority rather than conduct entirely outside of PMHA's authority. In short, the deprivations allegedly suffered by the Plaintiffs could have been prevented by predeprivation process. Assuming the truth of the Plaintiffs' allegations, had PMHA merely followed its own procedures for determining which applicants will receive HUD funds, it would not have deprived the Plaintiffs of the property interest to which they were allegedly entitled. Similarly, had PMHA offered some sort of fair hearing before it encouraged tenants to breach their leases, it would not have deprived the Plaintiffs of the liberty interest to which they were allegedly enti-

---

1. In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court overruled *Parratt* in part, to the extent that *Parratt* held that mere acts of negligence causing unintended deprivations could constitute due process violations. The rest of *Parratt* remains good law.

tled. Under *Zinermon* and *Mertik*, then, *Parratt* does not apply. I believe the district court erred to hold otherwise.

### III. Substantive Due Process

The majority holds that "there is no set of facts under which the plaintiffs could prove a substantive due process claim" because "[t]he right to participate in a federal housing funds program simply does not rise to the level of a right 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' and the actions of [the] defendants alleged in the complaint and proposed amended complaint do not even approach the level of 'shocks the conscience.'" Maj. Op. at 1111. The majority fails to address the substantive due process right, which is at the heart of the Plaintiffs' claim, the right not to be subject to arbitrary or capricious state action, either by legislative or administrative means. "[T]he Due Process Clause, like its forebear in the Magna Carta, was 'intended to secure the individual from the arbitrary exercise of the powers of government,'" which "serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams*, 474 U.S. 327, 331–32, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (quoting *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 111, 117, 28 L.Ed. 232 (1884); *Den ex dem. Murray v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1855); and citing Edward S. Corwin, *The Doctrine of Due Process of Law Before the Civil War*, 24 Harv.L.Rev. 366, 368 (1911)); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992) ("The Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression.") (quoting *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989)); *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

This Court recently reviewed "the many meanings of substantive due process," which it defined as "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir.1992) (quoting *Developments in the Law—The Constitution and the Family*, 93 Harv.L.Rev. 1156, 1166 (1980), and citing *Zinermon*, 494 U.S. at 125, 110 S.Ct. at 983; *Stratford v. State–House, Inc.*, 542 F.Supp. 1008, 1014 (E.D.Ky.1982), *aff'd*, 722 F.2d 742 (6th Cir.1983)). In the course of distinguishing various contexts in which the term 'substantive due process' is used, the court explained that what "is commonly referred to as a 'substantive due process right'" is "[t]he right not to be subject to 'arbitrary or capricious' action by a state either by legislative or administrative action." *Id.* at 1216–17 (citing *Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 308 (6th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Stratford*, 542 F.Supp. at 1014). *See also Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir.) ("This court has recognized two types of substantive due process violations: (1) official acts that are unreasonable and arbitrary and 'may not take place no matter what procedural protections accompany them,' and (2) official conduct that 'shocks the conscience.'") (quoting *Wilson v. Beebe*, 770 F.2d 578, 586 (6th Cir.1985) (*en banc*)), *cert. denied*, —— U.S. ——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994).

According to *Curto*, 954 F.2d at 1243, under this category of substantive due process analysis, "an ordinance or regulation is invalid if it fails to advance a legitimate governmental interest or if it is an unreasonable means of advancing a legitimate governmental interest." In *Curto*, the plaintiff, a gas station owner, claimed that a local ordinance violated his substantive due process rights by limiting the number of vehicles that were allowed to wait for service at his station. *Id.* at 1240.

*Pearson, Curto, Lakewood,* and *Harris* are all consistent with the Supreme Court's substantive due process jurisprudence. Oddly, the Sixth Circuit also has a line of recent cases in which it holds that substantive due process protects *only* fundamental rights, and affords no protection to state action that arbitrarily or capriciously deprives persons of their economic interests or contractual rights. *See Charles v. Baesler,* 910 F.2d 1349, 1352–56 (6th Cir.1990) (holding that plaintiff state employee's contractual right to promotion was not protected by constitutional guarantee of substantive due process because right was not fundamental); *Sutton v. Cleveland Bd. of Educ.,* 958 F.2d 1339, 1350–51 (6th Cir.1992) (holding that plaintiff state employee's contract right to be discharged only for cause was not protected by due process clause because it did not rise to level of fundamental right); *Holthaus v. Board of Educ., Cincinnati Pub. Schs.,* 986 F.2d 1044, 1046–47 (6th Cir.1993) (same).

Although *Charles, Sutton,* and *Holthaus* probably reached the correct result in the end, they did so by applying an incomplete substantive due process doctrine. These cases failed to acknowledge that a court is *obliged* to apply rational basis scrutiny whenever state conduct that is alleged to be arbitrary or capricious burdens property or liberty interests. To do otherwise is to ignore the "touchstone of due process." *Wolff,* 418 U.S. at 558, 94 S.Ct. at 2976. For example, in *Reno v. Flores,* which was decided after the Sixth Circuit's decision in *Holthaus,* the Court first rejected the notion that fundamental rights had been implicated in the issue before the Court, and then it held that the challenged regulation "*must* still meet the (unexacting) standard of rationally advancing some legitimate governmental purpose." —— U.S. ——, ——, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993) (emphasis added). Thus, according to the Supreme Court, once a court determines that no fundamental rights are implicated, the inquiry is not over, but rather a court is *required* to consider whether the challenged conduct passes rational basis scrutiny. In short, *Charles* and its progeny are not only based upon a misreading of binding Supreme Court precedent, but they are also inconsistent with it.

Relying on *Charles* and its progeny, both the majority and the district court failed to even consider the substantive due process right to be free of arbitrary or capricious government behavior within the context of rational basis scrutiny. It is this category of substantive due process that is most clearly implicated in the Plaintiffs' complaint. The Plaintiffs clearly pleaded that PMHA's alleged conduct, which included self-dealing, arbitrariness, and capriciousness, was not rationally related to any legitimate governmental interest. Therefore, the pleadings should have survived PMHA's motion to dismiss. *See, e.g., Wilkerson v. Johnson,* 699 F.2d 325, 328–29 (6th Cir.1983) (holding that plaintiffs' due process rights were violated when state licensing officials misapplied state licensing law in order to keep plaintiffs from competing in business against one official).

## IV. Equal Protection

The Supreme Court has recently summarized its longstanding doctrine regarding equal protection claims that do not implicate suspect classifications or fundamental rights:

[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification.... [T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis upon which might support it, whether or not the basis has a foundation in the record.

*Heller v. Doe by Doe,* —— U.S. ——, —— - ——, 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993) (citations and internal quotation marks omitted).

In the present case, the Plaintiffs freely conceded that their equal protection claim was not based upon an alleged fundamental right or suspect class. Rather, the Plaintiffs simply alleged that PMHA arbitrarily and capriciously classified the Plaintiffs differently than it did other applicants for HUD funds.

Just as the majority and the district court failed to recognize that they must apply rational basis scrutiny to the Plaintiffs' substantive due process claim, so did they fail to recognize that they must apply rational basis scrutiny to the Plaintiffs' equal protection claim. The district court held that "[t]o state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." J.A. at 164 (quoting *Henry v. Metropolitan Sewer Dist.,* 922 F.2d 332, 341 (6th Cir.1990). The court ignored the fact that in *Henry,* once the court determined that the plaintiff was not a member of a protected class, it held that "[t]herefore, we simply must consider whether the [state conduct that was at issue] 'is rationally related to a legitimate governmental interest.'" 922 F.2d at 341 (quoting *Hoke Co. v. Tennessee Valley Auth.,* 854 F.2d 820, 828 (6th Cir. 1988); *see also Silver v. Franklin Township Bd. of Zoning Appeals,* 966 F.2d 1031, 1036 (6th Cir.1992) ("The basis of any equal protection claim is that the state has treated similarly-situated individuals differently. Because Silver does not claim an infringement of a fundamental right or discrimination against a suspect class, we would review the Board's actions using a rational basis test.").

Moreover, both the majority and the district court also cite to *Booher v. United States Postal Serv.,* 843 F.2d 943, 944 (6th Cir.1988), which held that suspect classification "is an essential element of an equal protection claim." I believe this holding is inconsistent with both precedent and subse-

quent binding authority and ought not to be followed.

The fact that the Plaintiffs' burden is heavy does not justify the court's dismissal at this early stage in the litigation, before the Plaintiffs even had a chance to try to meet their burden.

## V. Denial of Leave to File Amended Complaint

The district court denied the Plaintiffs leave to file an amended complaint for three reasons. First, the court held that the proposed amendment added allegations of facts occurring prior to October 21, 1990, which, in the court's view, were barred by the statute of limitations. J.A. at 165. Second, the court held that the motion to file an amended complaint was untimely because the Plaintiffs could have filed the amended complaint as the original complaint, and because the Plaintiffs had no reason for filing an amended complaint except as "an untimely attempt to address by way of amendment the deficiencies argued in defendants' motion to dismiss." *Id.* Third, the court held, the proposed amended complaint would not cure the insufficiencies in Plaintiff's Fourteenth Amendment claims. The majority affirms the lower court's decision "[b]ecause the infirmities in the original complaint were not cured by the allegations in the amended complaint." Maj. Op. at 1105.

In light of my statute of limitations discussion above, I find that the first reason is invalid. Second, I think that the lower court abused its discretion in finding untimeliness. The amended complaint was filed within ninety days of the original complaint, prior to any significant discovery taking place. The Defendants were not prejudiced. Contrary to the district court's holding, untimeliness is not tested by whether a plaintiff could have filed the amended complaint at the time of the original complaint: "Delay that is not intended to harass the defendant is not in itself a permissible reason to refuse leave to amend.... [T]here must be at least some showing of prejudice to the opponent if the motion is to be denied." *Janikowski v. Bendix Corp.,* 823 F.2d 945, 951 (6th Cir.1987) (citation and quotation omitted). Nor is un-

**1118**

timeliness a matter of whether the amended complaint repairs perceived deficiencies in the original; otherwise all amended complaints would be untimely, for one would never seek to amend that which one perceives to be without deficiency.

Finally, as previously discussed, I am convinced that the Plaintiffs' amended complaint sufficiently stated their Fourteenth Amendment claims to survive PMHA's motion to dismiss. Therefore, all three of the district court's reasons for denying the Plaintiffs' motion for leave to amend were invalid. In the spirit of Federal Rule of Civil Procedure 15(a)'s instruction that leave to amend should be freely granted, I believe that the district court abused its discretion and should have been directed by this court to accept the amended complaint on remand.

I, therefore, respectfully **DISSENT.**